IN THE MATTER OF MONROE ACKERMAN, AN
ATTORNEY-AT-LAW.

Argued September 28, 1982 and September 13, 1983—.
Decided January 26, 1984.

*Richard J. Badolato* argued the cause for the Disciplinary Review Board (*Colette A. Coolbaugh,* Secretary, attorney).

*Monroe Ackerman* argued the cause *pro se.*

PER CURIAM.

These disciplinary proceedings generate disquieting echoes of *In re Ackerman,* 63 *N.J.* 242 (1973), in which this same respondent was publicly reprimanded on a charge that he "did not disclose to his client that the complaint had been dismissed or that a default had been entered as to the counterclaim, and further that, after the dismissal and the default, respondent affirmatively assured his client that the litigation was 'proceeding normally.'" So here, the local District Ethics Committee (Committee) filed with the Disciplinary Review Board (DRB) two presentments accusing Ackerman of violating *DR* 6–101(A)(2) for much the same conduct. The Committee discerned a "pattern of neglect * * * in [respondent's] representation of various matrimonial clients", in addition to "other specific disciplinary violations for his improper conduct with regard to particular clients." The DRB concluded that ethical infractions had

been established by clear and convincing evidence and recommended that respondent be suspended from the practice of law for two years.

I

In its Decision and Recommendation the DRB summarized the Committee's charges of misconduct as follows:

"(1) *DRB 81–124* (*Losseff Matter*)

"Mrs. Doris K. Losseff retained respondent sometime in 1974 to represent her in divorce proceedings. The matter was the subject of a settlement hearing held before the Honorable William A. Dreier in Union County. A misunderstanding occurred between respondent and Mrs. Losseff as to what stocks and bonds were to be considered subject to the settlement, and after the settlement had been placed on the record, both complainant and respondent were able to recognize the fact that the settlement reached was not the settlement intended. Respondent was to file the necessary motions to have the Court reconsider the settlement and the question of which stocks and bonds were to be disposed of under the settlement agreement.

"At the same time, respondent received two checks from the attorney for Mr. Losseff in payment of Mrs. Losseff's share of the equitable distribution. However, the checks did not include any amount for the bonds held by the Lackawanna Bar, a business entity in which the Losseffs were principals. Mrs. Losseff refused to cash them. Instead of returning them to the other attorney, respondent held on to the checks for approximately one year. Finally, after Mrs. Losseff had decided to cash the checks and bring suit against her former husband for a half share of the bonds, respondent obtained new checks from the other attorney, and paid Mrs. Losseff interest out of his own funds on the total amount for the year he had retained the checks.

"Respondent was clearly not diligent in pursuing the correction of the question of stocks and bonds. The motion was

finally filed by respondent in the summer of 1979, and included a request for alimony arrearages in addition to half the value of the bonds. The other portions of the motion were decided by [a Superior Court judge] on August 31, 1979, but [the court] requested a more detailed affidavit with regard to the bonds in the name of the Lackawanna Bar. The affidavit was thereafter filed and the motion was heard before [a different judge] on November 2, 1979. [The court] ruled on the motion a year later.

"Respondent compounded the delay in filing the motion and the delay encountered in awaiting the court's decision by failing to communicate adequately with his client. Respondent failed to return numerous telephone calls from Mrs. Losseff and cancelled a number of appointments with her.

"Hearing on this matter was first scheduled before the Board July 15, 1981, on which date respondent appeared and requested additional time within which to retain counsel. Two months later, on September 16, 1981, respondent, having failed to obtain counsel, appeared *pro se* and represented that a settlement had been reached with Mrs. Losseff, that a formal agreement would be drafted and executed, and that Mrs. Losseff would be compensated for the financial losses she incurred by reason of his delay and inactions. The Board by letter of September 30, 1981, requested respondent to forward a copy of the agreement prior to its October 21, 1981 meeting, at which time the matter would be given further consideration.

"Respondent failed to produce the agreement as requested. Further, the Board received information that Mrs. Losseff had been apparently waiting for several weeks for the agreement respondent had promised her.

"At the October 21 meeting, absent any reply from respondent, the Board determined to recommend to the Court respondent's immediate temporary suspension from the practice of law. This resulted in the Court's directive of November 17, 1981 that all charges then pending against respondent be broadened to include the conduct complained of in the Board's recommenda-

tion and that respondent be offered an opportunity to be heard prior to final recommendation.

"The matter was then scheduled for December 16, 1981, together with another motion brought by the Division of Ethics and Professional Services, for respondent's temporary suspension based upon his failure to answer a statement of charges stemming from another pending complaint. * * * This matter charged misrepresentation and negligence in the handling of a matrimonial matter.

"Respondent again appeared *pro se.* As to the Losseff matter, respondent presented copies of a handwritten agreement, providing for a $35,000 payment to Mrs. Losseff, signed by respondent and dated October 22, 1981. Respondent represented that their agreement had been filed with the Court, that $17,500 of the agreed $35,000 had been paid, and that final payment would be made after January 1, 1982. As to the other pending matter, respondent indicated that no answer was filed because he had in fact no defense to the complaint. The Board determined to adjourn the matter to January 20, 1982. By letter dated December 23, 1981, respondent was instructed to provide the following by January 12, 1982:

(a) proof of final payment to Mrs. Losseff;

(b) proof that the October 22, 1981 agreement had been filed; and

(c) an answer to the other pending complaint.

These items were furnished by respondent on January 15, 1981.

"In this matter, the Board concluded that respondent was unethical and unprofessional in his failure to communicate with his client by not returning calls to Mrs. Losseff and for cancelling numerous appointments without sufficient advance notice to the client so as not to cause unnecessary inconvenience. Furthermore, respondent neglected to follow through diligently on the resolution of the divorce settlement and stocks and bonds in violation of *DR* 6–101(A), due to his unreasonable procrastination.

"Following his appearance before the Board in 1981, it was recommended to the Court that respondent be publicly reprimanded for his actions. In making this recommendation, however, the Board was unaware of four other complaints, alleging similar violations of the Disciplinary Rules, which were pending before the District V Ethics Committee. The Supreme Court determined not to proceed on the Board's recommendation for discipline at that time and directed that the remaining matters be heard prior to any further action.

"(2) *DRB 83-85*

"A. *Rodbart Complaint*

"Complainant, a member of the New Jersey Bar, is the brother of Phoebe Amsterdam (Amsterdam), a former client of respondent. In August 1979, Amsterdam retained respondent to represent her in divorce proceedings against her husband. She promptly paid him his requested retainer of $3,500. Shortly thereafter, she requested respondent to file for *pendente lite* support for her and her children. Respondent advised against doing so immediately. Amsterdam waited, but when her financial situation began to deteriorate seriously, she again sought respondent's assistance. However, she experienced enormous difficulty in contacting respondent because of his repeated failure to return her telephone calls. Amsterdam testified that these communication difficulties extended for the duration of their relationship. Finally, in February of 1980, a hearing was held and Amsterdam was awarded temporary support.

"After the February 1980 support hearing, Amsterdam was served interrogatories by her husband. She met with respondent who requested that she supply certain information, which she did. Respondent then promised to prepare the answers to interrogatories for her signature.

"Respondent never prepared the answers to interrogatories. As a direct consequence, Amsterdam's complaint for divorce was dismissed on July 21, 1980. Respondent did not inform Amsterdam of this dismissal. Instead, he repeatedly assured her that

the matter would be proceeding to trial. It was not until November 5, 1982, after Amsterdam had dismissed respondent as her attorney and had retrieved her file, that she discovered the dismissal.

"Concurrent with his promise to prepare the answers to interrogatories, respondent also agreed to retain on Amsterdam's behalf an appraiser to assess the value of Mr. Amsterdam's business. As with the answers to interrogatories, respondent informed Amsterdam that he would take care of the appraisal and, at one point, indicated that the appraisers were trying to contact her husband. He attributed the delay in receiving the appraisal report to the failure of her husband to meet with the appraisers. In fact, respondent had never contracted for an appraisal. Although he had made some initial contact with the appraisers, he had not actually hired them, nor had he responded to their subsequent inquiries as to whether they should begin work on the case. Notwithstanding this fact, respondent later informed Amsterdam on two occasions that the business appraisal had been completed and that the value of the business was 2.5 million dollars, an amount highly favorable to his client. Again, Amsterdam did not discover respondent's failure to obtain the business appraisal until November 5, 1980 when she spoke to the appraisers allegedly retained by respondent. She was then told that there had not been any appraisal of her husband's business. She confirmed this in her examination of the matrimonial file obtained from respondent on that same date.

"Unbeknownst to Amsterdam, her husband had filed a counterclaim for divorce. Consequently, although her own complaint was dismissed for failure to answer her husband's interrogatories, the matter was still before the trial court based on her husband's complaint. Amsterdam did not know of this and continued to believe respondent when he told her that she would soon be going to trial. Indeed, in late July, a week after the dismissal of her complaint, she and her brother, complainant in this disciplinary proceeding, went to respondent's office and

spoke to him about the interrogatories and the business appraisal. Respondent knew at that time of the dismissal but did not tell either Amsterdam or complainant about it, indicating that the matter was proceeding in its normal course.

"During the month of September, respondent informed Amsterdam that a court date would soon be forthcoming. On several occasions, he told her to come to court to await her trial. She did so, bringing her accountant, but on each occasion respondent said the matter was adjourned. Finally, a trial was scheduled for October 21, 1980. Amsterdam met with respondent that morning to prepare for trial. As they left his office to go to court, Amsterdam stated that respondent threw himself down the stairs. Thereupon, she and her accountant took respondent to the hospital, necessitating another adjournment. It was at the hospital, in the presence of her accountant, that respondent reiterated to Amsterdam what he had told her a day earlier, that her husband's business had a 2.5 million dollar appraisal value.

"Following the October adjournment, the matter was rescheduled for one week later. Respondent then had a dizzy spell, and the matter was postponed on that date as well. It was thereafter listed for November 3, 1980. Amsterdam, her accountant and respondent waited at the court all morning without being called for trial. At lunch time, respondent returned to his office and Amsterdam returned home. Later that afternoon, respondent telephoned her, stating that he was at his doctor's office because of an ulcer problem. Amsterdam assumed that the matter had been adjourned again. In fact, the trial on her husband's complaint had begun after the judge had spoken with respondent. Amsterdam was not informed of this.

"The trial continued on November 5, 1980. Again, Amsterdam and her accountant were at the court waiting for respondent. After some delay, Amsterdam was called into court and told by the trial judge that respondent had been involved in a one-car accident outside his office. Amsterdam left the court

and decided to ascertain for herself what was going on. At this point, she learned from the appraisers, supposedly retained by respondent, that they were never hired. She then obtained her files from respondent and discovered, for the first time, that her case had been dismissed and that the trial was proceeding on her husband's counterclaim. Amsterdam dismissed respondent as her attorney.

"After Amsterdam retained new counsel, respondent agreed to a $16,500 settlement to be paid to Amsterdam as compensation for part of her lost expenses.

"At the hearing before the District V Ethics Committee, respondent did not deny any of the material allegations testified to by Amsterdam. This was consistent with his earlier written answer to the formal complaint in which he conceded that he had no defense. He did deny, however, that he threw himself down the stairs.

"By clear and convincing evidence, the District V Ethics Committee concluded that respondent violated DR 1–102(A)(1), (4) and (5) [dealing generally with misconduct]; DR 6–101(A)(2) [failure to act competently]; and DR 7–101(A)(1) and (3) [requiring zealous representation of a client].

"B. *Kruger Complaint*

"Complainant Richard O.S. Kruger (Kruger) retained respondent in 1974 to represent him on appeal from an adverse matrimonial judgment. Specifically, complainant was dissatisfied with the trial court's failure to award him a divorce on grounds of extreme cruelty and the court's determination that complainant's military pension and disability benefits were subject to equitable distribution. Respondent agreed to the representation and was paid his requested retainer of $2,500.

"Respondent's firm took the appeal. Argument before the Appellate Division was handled by respondent's associate (Braun), for whom respondent accepted responsibility. Complainant did not know of the associate's participation in the appeal until he received a copy of the decision in the Appellate

Division (*Kruger v. Kruger*, 139 *N.J.Super.* 413 (1976)). Complainant was unhappy with that decision and with the fact that respondent did not handle the matter personally. Complainant then attempted to contact respondent in order to discuss an appeal to the New Jersey Supreme Court. His attempts to communicate with respondent were wholly unsuccessful. Despite repeated telephone calls to respondent's office, extending from February 1976 until July 1977, complainant was unable to speak with respondent directly. Instead, he spoke with either the secretaries in the office or with Braun. Both the secretaries and Braun promised to relay complainant's messages to respondent, but respondent never personally communicated with complainant.

"Though there were obvious difficulties in communication, respondent did undertake an appeal to the Supreme Court, which affirmed with modifications the Appellate Division decision (*Kruger v. Kruger*, 73 *N.J.* 464 (1977)). The Appellate Division's decision to uphold the sale of the marital home and the equitable distribution of the proceeds was not disturbed by the Supreme Court.

"After receipt of the Supreme Court decision from respondent, complainant did not hear further from either respondent or his associate. Then, in May 1978 complainant received directly from his former wife's attorney notice of a hearing before the trial court to arrange for the sale of the marital home. The hearing was scheduled for June 16, 1978. Complainant then received correspondence from respondent's associate Braun that also informed him of this impending hearing. Complainant, now living in Florida, contacted respondent's firm on June 8, 1978 to arrange for an adjournment in order to file a response. Again, he was unable to speak with respondent directly, and so spoke with Braun. Braun assured him that the hearing would be adjourned and that complainant would be afforded an opportunity to file his reply. On June 13, 1978, Braun telephoned complainant to inquire about the status of the reply and to request a $750 fee for representation at the upcoming hearing.

Complainant promised to send the fee to respondent. Braun then informed him that it was not necessary to send his reply immediately since the adjournment would be secured. He was instructed to hold his reply until respondent contacted him.

"On June 26, 1978, complainant received a letter from the associate dated June 17, 1978, which recited the terms of the financial agreement discussed on June 13th. The letter did not mention either the scheduling of the hearing or the preparation of the reply.

"The hearing originally scheduled for June 16, 1978 was adjourned for one week to June 23, 1978. Complainant was not informed of the adjournment nor of the new hearing date. On June 27, 1978, he received a copy of a letter dated June 22, 1978, from respondent to the judge assigned to the hearing, informing the court that respondent would not be representing complainant at the hearing.

"Complainant heard nothing further from respondent or his associate Braun. Then, on July 10, 1978, complainant received a telephone call from his real estate broker in New Jersey informing him that the marital home had been sold pursuant to an order entered as a result of the June 23rd hearing. Neither respondent nor his associate had appeared at that hearing.

"Complainant telephoned respondent shortly thereafter to ascertain what had happened at the hearing. Although he had received a copy of the June 22nd letter from respondent to the judge, complainant nevertheless believed that respondent continued to represent him and had, in fact, done so at the hearing. However, when complainant spoke with Braun, the latter claimed ignorance of both the hearing and the sale of the house. Braun promised to communicate with complainant once he had investigated the problem further. No further communication followed.

"On July 31, 1978, complainant received a copy of the order entered on June 23, 1978. He called respondent again and spoke to Braun who still professed ignorance of the hearing and order.

The next day complainant mailed a check for $750, respondent's requested retainer. On August 9, 1980, complainant received back from Braun a letter acknowledging receipt of the check and advising him that an application for a rehearing would be made. A rehearing did, in fact, occur at the end of December 1978, at which all of complainant's requests for relief were denied. Complainant did not appear at the rehearing since he was never notified of its date. He learned of the result only upon receipt of a court order in January or February 1979.

"The District V Ethics Committee found respondent guilty of failing to represent his client at the hearing that resulted in the sale of the marital home. Though respondent claimed this resulted from complainant's failure to pay promptly the $750 retainer, the panel found that respondent had never made it clear to his client that he would not be appearing unless payment was received. The panel was also troubled by the fact that respondent never obtained either his client's or the court's consent to withdraw from the matter pursuant to *R.* 1:11–2, *Kriegsman v. Kriegsman*, 150 *N.J.Super.* 474, 479–80 (App.Div. 1977). Finally, the panel determined that respondent had failed to communicate adequately with complainant about the various aspects of his case. The Committee concluded that respondent had violated *DR* 6–101(A)(2).

"C. *Kasher Complaint*

"Complainant retained respondent in June 1976 to represent her in divorce proceedings against her husband. She paid respondent his requested fee of $5,000. In May of 1978, a judgment of divorce was entered awarding her custody of the children of the marriage and requiring her husband to pay for their support and education.

"Approximately one year later, complainant's husband fell into arrears in the support payments. Complainant went back to respondent to seek enforcement of the judgment. Respondent agreed to represent her at no additional fee. As part of his representation, respondent requested that the complainant sup-

ply him with various sorts of financial information. Complainant did so on a continuing and regular basis. However, she experienced considerable difficulty in communicating with respondent directly.

"Respondent attempted to locate complainant's husband to enforce the original judgment. He was unable to do so. Nonetheless, in September 1980, respondent obtained an order from the court requiring complainant's husband to comply with the terms of the final judgment of divorce and to fix arrearages.

"Complainant learned that her husband had moved to Arizona in January 1981. She told this to respondent. He informed her that they would now need an Arizona attorney to seek enforcement of the judgment. He promised to contact an Arizona attorney on her behalf.

"Numerous delays ensued. During this period, from January 1981 until October of that year, respondent continually told complainant that he was working on the matter. All communications between complainant and respondent were oral. On a number of occasions, she requested copies of correspondence that he said had been sent to the Arizona attorney, but none was ever given to her. Finally, in October 1981, respondent told complainant that the Arizona attorney whom he was using was named Goldman. Complainant indicated that she would like to speak with him.

"Respondent agreed to set up a conference call between himself, complainant and Goldman on December 9, 1981. He told complainant to meet him at his office at 6:00 p.m. When complainant arrived at the office at the appointed hour, the office was closed.

"Complainant telephoned respondent the next morning. Respondent claimed that she had cancelled the appointment. She denied it. Complainant then decided to call attorney Goldman in Arizona herself. She pretended to be respondent's secretary and asked for the status of the Kasher case. She was told that Goldman had never heard of either that case or of respondent.

Complainant called Goldman's office again later that afternoon and was again given the same information.

"The following morning (December 11, 1981) complainant confronted respondent with her findings. Respondent admitted to her that he had done nothing to enforce the judgment and that he had never contacted an attorney in Arizona. Complainant then asked for return of her files. Respondent told her to come back the next day. When she returned the next day, respondent gave her the files and wrote out a $1,000 check. He then told her to get another lawyer.

"Though respondent disputed much of complainant's testimony, the District V hearing panel found, by clear and convincing evidence, complainant's testimony to be more credible. The panel found respondent negligent in his failure to retain Arizona counsel, to return his client's telephone calls, and to appear at the scheduled conference call meeting. The panel also found that respondent had materially misrepresented to his client the fact that he had retained counsel in Arizona to work on his client's behalf. The panel concluded that respondent had violated DR 1–102(A)(1), (4) and (5); and DR 6–101(A)(2).

"D. *Meredith Complaint*

"Complainant, a member of the New Jersey bar, filed this complaint on behalf of his sister, Eleanor Hoisington (Hoisington), a former client of respondent.

"Hoisington retained respondent in July 1979 to represent her in a divorce initiated by her husband. Almost from the outset, Hoisington was dissatisfied with the representation. She claimed that whenever she met with respondent, after their initial conference, they would always go over the same financial items and not discuss any other matters of concern to her. In particular, respondent did not pursue Hoisington's repeated requests for temporary support for herself and her children. In fact, respondent did not file any motions for support until April 1980, although Hoisington visited him in his office approximate-

ly eight times to apprise him of her worsening financial condition.

"Despite these meetings, Hoisington experienced considerable difficulty in communicating with respondent. Because her home was over an hour's drive from his office, she repeatedly attempted to telephone respondent to discuss her support problems and inquire into the status of her case. Only rarely would respondent speak to her. Instead, she would speak to one of respondent's secretaries, whom she would ask for by name. This secretary would promise to relay her messages and have respondent return her calls. Rarely did respondent do so.

"In frustration, Hoisington wrote to respondent seeking information about her case. Her letter went unanswered as well. On those occasions when Hoisington would meet with respondent, she would always question him as to his lack of communication. His response would be that he was very busy; that he had been sick and hospitalized; that he had been involved in a car accident; and that he had fallen down the stairs and injured himself. He always hastened to reassure Hoisington, however, that her matter was under control and progressing towards resolution.

"In April 1980, Hoisington and respondent met with Mr. Hoisington and his attorney to negotiate a settlement. The meeting was unsuccessful. Thereafter, for a period of one year until the matrimonial trial in April 1981, Hoisington again attempted without success to communicate with respondent. Her telephone calls went unreturned, and the eight or nine letters that she mailed to him remained unanswered. The lack of communication became so aggravated that during one of the conversations with respondent's secretary to whom she regularly spoke, the secretary told her she was "too much of a lady" and that if she wanted action, she should get "good and darn mad."

"In April 1981, the matrimonial action between the Hoisingtons was tried to completion. The trial judge entered an order equitably distributing the marital property. Respondent did not discuss with Hoisington any of the details of the judge's deci-

sion. She was not advised of her right to appeal. When she expressed some dissatisfaction at the final outcome, respondent told her that nobody is very happy in a divorce proceeding.

"For a while after her divorce, Hoisington had no further communication with respondent. She believed that this was unnecessary since a judgment had now been entered. However, the money she expected to receive as part of the equitable distribution of the marital property was not forthcoming. The reason for this, as Hoisington later learned, was respondent's failure to forward to the trial judge a copy of the Consent to Final Judgment. This document had been prepared by Mr. Hoisington's attorney and sent to respondent on May 21, 1982. On July 15, 1981, respondent replied that he was redrafting the Judgment to reflect certain changes he wanted. As of August 17, 1981, these changes had not been made, nor had respondent contacted Mr. Hoisington's attorney.

"After repeated telephone calls, which were not returned, she wrote to him:

'I am somewhat puzzled as to the delay in having the consent Final Judgment of Divorce forwarded to Judge Fox for his signature. Could you please call me at your earliest convenience to discuss this matter.'

\*     \*     \*     \*     \*     \*     \*     \*

'I trust that I will hear from you shortly.'

"Respondent never contacted his client or his adversary. Instead, it fell upon Hoisington's brother and sister-in-law, both attorneys, to complete the matter.

"The hearing panel concluded that respondent violated *DR* 6–101(A)(2) for the overall neglect of his client in failing to communicate with her, to seek support on her behalf, and to complete the matrimonial action that he was retained to handle."

## II

After reviewing the complete record the Board determined that the conclusions of the Committee were fully supported by clear and convincing evidence.

On the Losseff complaint the Board found respondent's conduct to be unethical and unprofessional in two respects: his failure to communicate with his client by not returning her telephone calls, and his cancelling numerous appointments without sufficient advance notice to the client to avoid unnecessary inconvenience. In addition, the Board concluded that Ackerman neglected to follow through diligently on the resolution of the divorce settlement, in violation of DR 6–101(A), "due to his unreasonable procrastination."

We agree. Before this Court respondent acknowledged that he held on to the checks representing Mrs. Losseff's share of the equitable distribution for at least nine months and admitted that the "misconstruing" of the settlement arrangement, which caused the delay (except for that period attributable to the trial court's inaction), was his fault. He further conceded that of about thirteen appointments, he had cancelled ten. Our independent review of the record confirms the finding of a violation of DR 6–101(A) by clear and convincing proof.

In the Kruger, Kasher, Meredith-Hoisington and Rodbart matters the DRB concluded that the various complaints demonstrated a pattern of neglect that was simply inexcusable. Our careful canvassing of the record leads us to the same result. Ackerman's handling of these clients' affairs was characterized by delay, lack of communication, and failure promptly to attend to the final resolution of problems with which he had been entrusted. In addition, as the DRB pointed out, in certain of the cases respondent compounded the wrongs by making deliberate misrepresentations to his client in order to conceal his neglect.

In Rodbart he informed his client that her complaint for divorce was still pending one week after the court dismissed it for respondent's failure to prepare her answers to interrogatories. He also told her that he had hired an appraiser to assess her husband's business, and he provided her with a favorable appraisal though no appraiser was ever retained. In Kasher, respondent promised his client that he would actively pursue enforcement of a court order against her husband who had moved to Arizona. To this end, he stated that he had retained an Arizona attorney to act on her behalf. In fact, respondent never contacted

the Arizona counsel and the judgment remained unenforced. Finally, in both of these matters, respondent attempted to absolve himself of his professional misdeeds by paying the clients off.

Moreover, the DRB observed—and again we are constrained to agree—that respondent's neglect was not confined to his clients. In the Kruger, Kasher, Meredith-Hoisington and Rodbart cases respondent failed to cooperate with the Committee's investigation. In the Rodbart matter the Committee was obliged to apply to the Board for respondent's temporary suspension to compel an answer to the Committee's complaint. Ackerman has not explained this failure of cooperation.

## III

Respondent does not deny that in many instances he did not promptly return clients' telephone calls or respond to their letters, although he insists he did so eventually. His quarrel is not so much with the findings of the DRB—although, to be sure, he does in some instances dispute them—as it is with what he terms the "degree" of dereliction that the Board found. In one sense his defense boils down to an assertion that as a busy matrimonial practitioner, with one associate, who finds himself "on his feet" in the courtroom for extended periods of time, he cannot give his clients the personal attention they demand.

We are not unsympathetic to the dilemma created by demands on a lawyer's time. The problem is not that of the matrimonial lawyer alone but is endemic to the trial bar. When that problem is not resolved, the impact is felt by the trial courts, professional colleagues, and by the clients and general public. When lawyers do not give their attention to clients' affairs, the consequences have an emotional dimension quite beyond the dollar costs, particularly in matrimonial cases. Nowhere are the contestants more vulnerable, more emotionally exposed, more fragile than in the matrimonial arena. In no area of the practice should the lawyer be more punctilious, more compassionate, and more genuinely concerned than with the matters entrusted to him or her by a matrimonial client. There must be

a rational accommodation of a busy trial practice and the legitimate demands of individual clients, to the end that the interests of the clients not suffer. The conventional remedies of increase in staff and reduction in volume of business immediately suggest themselves as practical approaches. Doubtless there are others.

Respondent's failure to have made such an accommodation is graphically demonstrated by the record before us. Even if we put to one side Ackerman's disagreements with the charges and findings in all the other cases, we have his admission of ethical transgressions in the Rodbart matter and they are sufficient in themselves to warrant the imposition of discipline. He acknowledges that he did not move Ms. Amsterdam's case, that he did not inform the client that the case had been dismissed, that he misrepresented to her that he had retained appraisers when in fact he had merely spoken to them, and that he was in other respects negligent. The parallel to *In re Ackerman, supra,* 63 *N.J.* 242, is striking, but as the DRB perceived, respondent's conduct can no longer been seen as "distinctly out of character." *Id.* at 244.

In keeping with the DRB's recommendation we have concluded that respondent's ethical infractions call for suspension from the practice of law for a period of two years. See *In re Zeitler,* 85 *N.J.* 21 (1980). Moreover, we share the Committee's and the DRB's sense of mystification that respondent, an experienced member of the matrimonial bar, could have permitted this quandary to envelop him. The pattern of neglect suggests a possible medical or psychiatric dysfunction. We therefore accept the DRB's recommendation that prior to his readmission, respondent be required to present medical and psychiatric evidence of his capacity to return to the practice of law. See *In re Goldstaub,* 90 *N.J.* 1 (1982). Finally, respondent is required to reimburse the Administrative Office of the Courts for appropriate administrative costs, including those for the production of transcripts.

So ordered.

*For suspension* —Chief Justice WILENTZ and Justices CLIF-
FORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and
GARIBALDI—7.

*Opposed* —None.

## ORDER

It is ORDERED that MONROE ACKERMAN of SHORT
HILLS be suspended from the practice of law for a period of
two years and until he can produce satisfactory medical and
psychiatric evidence of his fitness to practice law, effective
February 20, 1984, and until further order of this Court; and it
is further

ORDERED that respondent reimburse the Administrative Of-
fice of the Court for appropriate administrative costs, including
the production of transcripts; and it is further

ORDERED that respondent be restrained and enjoined from
practicing law during the period of his suspension; and it is
further

ORDERED that respondent comply with all the regulations of
the Disciplinary Review Board governing suspended, disbarred
or resigned attorneys.