IN THE MATTER OF JOHN V. GILL, AN ATTORNEY AT LAW.

Argued September 27, 1988—Decided March 3, 1989.

*William R. Wood,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*F. Gerald Fitzpatrick* argued the cause for respondent (*Fitzpatrick & Fitzpatrick,* attorneys).

PER CURIAM.

This matter involves an attorney-disciplinary proceeding prompted by three complaints filed against the respondent, John V. Gill. The complaints generally allege a pattern of

neglect and conduct indicating unfitness to practice law. The Disciplinary Review Board (DRB) determined that respondent's actions "constituted conduct involving dishonesty, fraud, deceit and misrepresentation," and demonstrated an "appalling pattern of neglect." Further, the DRB found respondent had breached his fiduciary obligation to a client by failing to forward $500 to the client's husband, but concluded that respondent had not knowingly misappropriated clients' funds. Respondent voluntarily withdrew from the practice of law in 1983. Following a motion for temporary suspension by the Office of Attorney Ethics, respondent consented to his suspension from the practice of law in January 1984. A majority of the DRB recommended that respondent's consensual suspension in January 1984 to the present be deemed sufficient discipline. Among other conditions, the DRB recommended that respondent's reinstatement be subject to respondent's submitting proof of his fitness to practice law in the form of a psychiatric report. After a thorough and independent review of the record, we adopt the disposition recommended by the DRB.

I.

Respondent was admitted to the Bar of the State of New Jersey in 1974. Respondent was a sole practitioner when the incidents underlying this disciplinary action arose in 1979. Before this Court, respondent neither denies the allegations against him nor disputes the factual conclusions and recommendations of the DRB. The facts surrounding the three complaints follow.

### The Infante Matter

In October 1977, Madelyn Infante fell in a shopping-center parking lot, fracturing a bone in her arm. Mr. and Mrs. Infante retained respondent to represent them in a negligence action against the owner of the shopping center. In October 1979, respondent filed a complaint on behalf of the Infantes, but neither served the complaint on the defendant nor took any

further steps to litigate or settle the claim. As a result, the matter was dismissed for lack of prosecution.

From the time of the Infantes' initial visit in 1977 until December 1982, respondent either avoided communicating with his clients or misrepresented the status of the suit. At one point, respondent falsely informed Mrs. Infante that the defendant, who never had been served, had agreed to settle the case for $18,000. On another occasion, respondent told Mrs. Infante that she needed a medical report and drove her to a doctor, giving her $100 for the examination. The examination was conducted and a report was drafted. However, respondent never took steps to obtain a copy of the report. Finally, in December 1982, respondent visited the Infantes' home and admitted that the case had been dismissed because of his failure to serve a summons and complaint. He also acknowledged his misrepresentation about the settlement offer. The Infantes subsequently instituted a civil action against respondent, but after depositions elected to discontinue the matter. That suit was eventually dismissed for lack of prosecution.

### The Ferrara Matter

Respondent was retained by Joan Ferrara in 1979. Her former husband, Charles, from whom she was divorced in 1975, had died in a traffic accident in California. Although Mrs. Ferrara had no knowledge about the specific circumstances of the accident, she engaged respondent in order to pursue a possible wrongful-death claim on behalf of her two minor children. Respondent accepted a $50 retainer. From May 1979 until early 1982, respondent informed Mrs. Ferrara that he had retained California counsel and that the case was proceeding. In early 1982, respondent told Mrs. Ferrara that he had discharged the California attorney and was in the process of retaining new counsel. During the next several months, Mrs. Ferrara was unable to learn more about the status of her suit despite several attempts to do so. In November 1982, Mrs. Ferrara was told by respondent that he had settled the case for

$46,000 and that she would have the money by the end of December 1982. By January 1983, Mrs. Ferrara had heard nothing more from respondent about the settlement. Mrs. Ferrara called respondent, and he informed her that the delay was caused by her son's status as a minor. Respondent assured his client she would receive the settlement money on the following Monday. When no check arrived, Mrs. Ferrara again called respondent. Respondent told Mrs. Ferrara to be patient, and represented that California counsel would be mailing the settlement check forthwith. Mrs. Ferrara asked for the name of the California lawyer but respondent refused to divulge it. When no settlement documents or monies were forthcoming, Mrs. Ferrara sought new counsel, who advised her to contact the Ethics Committee.

After an investigation by Mrs. Ferrara's new counsel, it was learned that no suit had ever been filed on her behalf in California. The failure to file suit resulted in the running of the statute of limitations. That attorney also obtained copies of the police report concerning the accident and learned for the first time that Charles Ferrara had been contributorily negligent and that there was little, if any, chance that a claim could successfully have been asserted on behalf of the two minor children. The attorney instituted a malpractice claim against respondent, but Mrs. Ferrara ultimately determined not to pursue the action.

### The Vanderbeck Matter

Respondent represented Margaret Vanderbeck in her divorce from Charles Vanderbeck in 1979. At the time of her divorce proceeding, Mrs. Vanderbeck had a workers' compensation claim pending against her employer. The judgment of divorce provided that Mr. Vanderbeck would receive 20% of the net recovery awarded to Mrs. Vanderbeck in the workers' compensation matter.

Mrs. Vanderbeck subsequently was awarded $2,500 for her workers' compensation claim. In November 1981, the workers' compensation carrier mailed respondent two checks, one in the amount of $500 payable to respondent as his fee, and one in the amount of $2,000, payable to both respondent and Margaret Vanderbeck. Respondent deposited the $500 check in his business account and the $2,000 check in his trust account. Pursuant to the 1979 judgment of divorce, $500 of the award was to be paid to Charles Vanderbeck.

In June 1982, Charles Vanderbeck received a check for $500 drawn on respondent's trust account. Mr. Vanderbeck attempted to cash the check at the bank on which it was drawn. The bank refused to honor the check because the account was closed. The evidence indicated that in December 1981, respondent's trust-account balance was $28.41 and remained substantially at that level until the account was closed by the bank. Respondent apparently was unaware at the time that the bank had closed his trust account. In January 1983, Charles Vanderbeck instituted proceedings to enforce the divorce settlement, and an order was entered compelling respondent to pay Vanderbeck the sum of $500, representing his share of Margaret Vanderbeck's workers' compensation award. In April 1983, Charles Vanderbeck was paid $500 by respondent's counsel.

Before the District Ethics Committee, respondent testified that he gave the $500 he held for Charles Vanderbeck to his client, Mrs. Vanderbeck, because she was in desperate financial straits. When asked whether the banking records reflected this transfer, respondent's counsel informed the Committee that the records were not then available but would be forwarded to the Office of Attorney Ethics shortly after the hearing. After the bank records were submitted, respondent stipulated that the $2,000 sum deposited to respondent's trust account on November 25, 1981, was paid out of that account as follows:

| 11/25/81 | Margaret Vanderbeck | $1,000.00 |
|----------|---------------------|-----------|
| 11/25/81 | Margaret Vanderbeck | 400.00 |
| 11/25/81 | Margaret Vanderbeck | 200.00 |
| 11/14/81 | John V. Gill | 200.00 |
| 12/14/81 | John V. Gill | 150.00 |
| 12/23/81 | John V. Gill | 40.00 |

Thus, of the $2,500 award, $1,600 was paid to Mrs. Vanderbeck. Of the remaining $900, $390 was paid to respondent from the trust account and $500, representing respondent's fee, was deposited directly in respondent's business account. Respondent stipulated that "[n]o part of the $500 sum deposited to Gill's business account on November 25, 1981 was paid to Margaret Vanderbeck or Charles Vanderbeck at any time."

In December 1983, a motion for temporary suspension was filed by the Office of Attorney Ethics. Respondent consented to temporary suspension on January 9, 1984, and remains suspended at this time. As a result of the Infante, Farrara, and Vanderbeck complaints, the District VI Ethics Committee filed a presentment against respondent. Hearings were held before the District VI Ethics Committee and the DRB.

The DRB concluded:

[R]espondent's actions constituted conduct involving dishonesty, fraud, deceit and misrepresentation, conduct which thereby adversely reflected on his fitness to practice law. *DR* 1–102(A)(4) and (6). Respondent further failed in his duty to seek the lawful objectives of his clients and to carry out his contracts of employment. He thereby prejudiced his clients. *DR* 7–101(A)(1), (2) and (3).

Additionally, respondent had a duty to forward $500 to Charles Vanderbeck. A lawyer's fiduciary obligation applies to those other than his clients who have reason to rely on him. *Matter of Schwartz*, [99 *N.J.* 510, 517 (1985)]. The Board finds respondent breached that duty.

Respondent's actions were clear, outright violations of numerous disciplinary rules. *DR* 1–102(A)(1). Finally, when all of his actions are considered together, the Board concludes respondent demonstrated an appalling pattern of neglect. *DR* 6–101. He was unfit to practice law. *DR* 1–102(A)(6).

In addition, respondent conceded he did not maintain trust account records in accordance with *Rule* 1:21–6. Accordingly, the DRB found respondent in violation of *DR* 9–102(C).

This Court issued an order to show cause why respondent should not be disbarred or otherwise disciplined.

## II.

As noted, respondent does not contest the factual findings or recommendations of the DRB. *Supra* at 247. Rather, respondent maintains his actions do not warrant disbarment.

The DRB found that:

Respondent entered into contracts of employment. He thereafter failed to take the requisite action to pursue the interests of his clients. *See In re Hollis* [95 *N.J.* 253, 261 (1984)]; *In re Ackerman*, 95 *N.J.* 147, 163 (1984). The Board concludes respondent thereby failed in his duty to pursue diligently his clients' interests. *See Matter of Wallace*, 104 *N.J.* 589, 593 (1986); *Matter of Schwartz*, 99 *N.J.* 510, 518 (1985); *In re Haft*, 98 *N.J.* 1, 6 (1984).

Respondent compounded his wrongs by failing to face up to his professional obligations. At first he attempted to avoid his clients by simply not communicating with them. When he was finally forced into confrontations, he further compounded his derelictions in order to conceal his neglect: he deliberately misrepresented the status of the cases. *See Matter of Bancroft*, 102 *N.J.* 114, 123 (1986); *In re Ackerman, supra*, 95 *N.J.* 163; *In re Rabb*, 83 *N.J.* 108 [109], 120 (1980); *In re Loring*, 73 *N.J.* [282] 283, 290 (1977).

In the *Ferrara* matter he lied to his client about the retention of a California attorney and the filing of the complaint. He then lied about his dissatisfaction with that attorney and the need to retain a new attorney. He further lied about the potential settlement.

In the *Infante* matter he also continually lied. His failure to serve the summons and complaint resulted in the case being dismissed, but he never told this to his client. *See In re Rosenthal*, 90 *N.J.* 12, 16 (1982). Instead, he told the client the matter was ripe for settlement and there was a need for a medical report. He even advanced the client $100 for a doctor's visit and personally transported the client to the doctor's office, when such a visit was obviously unnecessary. Finally, he told this client there had been a settlement offer and, when she accepted the offer, that she would receive the money shortly thereafter.

The DRB also determined that respondent breached his duty to forward $500 to Charles Vanderbeck, but considered his dishonored trust account check to be a "single isolated instance that resulted from admittedly inadequate records." We view the Vanderbeck matter somewhat differently.

The record discloses that of the $2,500 awarded to respondent's client, Margaret Vanderbeck, on her workers' compensa-

tion claim, twenty percent ($500) was to be given to Charles Vanderbeck as part of an earlier divorce settlement. The evidence also indicates that respondent deposited $2,000 of the award in his trust account and the remaining $500 into his business account as his fee. Respondent then wrote Margaret Vanderbeck three checks totalling $1,600. There is no record of any further funds being forwarded to Margaret Vanderbeck. Within three weeks of the deposit, respondent issued three checks made payable to himself totalling $390. No portion of the $500 in respondent's business account was paid to Margaret or Charles Vanderbeck.

When asked at the hearing before the District Ethics Committee why he failed to forward $500 to Charles Vanderbeck as the settlement agreement provided, respondent testified:

> When I got the check, I deposited the $500 check in my trust account. Subsequently, as you might have guessed, it was a bitter thing. She had undergone psychiatric therapy and she really needed the money and I should have gone right into court then and filed for a—that the court release the funds to her because she was in desperate straights [*sic*]. I never did that. Again, it was part of the pathology or whatever it was of my illness. So I never did that.
>
> She didn't have the money to give back to me when Mr. Vanderbeck—when I had to give the check so I fully intended to take the money out of my own funds and put it into an account which I subsequently did within a couple of weeks after this happened. I gave it to Mr. Fitzpatrick and he paid Mr. Vanderbeck the money.
>
> Q. So it's your testimony that you never misappropriated this check for the benefit of your own use?
>
> A. No.

With regard to this testimony, the DRB concluded:

> When respondent received the proceeds from the workers' compensation action, he testified he fully intended to pay Charles Vanderbeck. However, *when he learned his client was in financial need, he instead gave her the money.* He testified he then intended to make application to the court for a modification of the divorce judgment to support payment to his client rather than to Charles Vanderbeck. Unfortunately, respondent neglected to follow through and make such an application. [Emphasis added.]

Essentially, respondent testified that he gave his client the $500 that belonged to Charles Vanderbeck. Yet, as was later stipulated and as the bank records indicate, only $100 of the $500 earmarked for Mr. Vanderbeck was forwarded to Marga-

ret Vanderbeck. Of the $400 balance, $390 was withdrawn by respondent, apparently for his own use. Charles Vanderbeck did not receive the funds due him until a year-and-a-half later.

At oral argument before this Court, respondent was questioned about the discrepancy between the testimony before the District Ethics Committee and those facts subsequently stipulated. Respondent's counsel explained that respondent was mistaken about paying Margaret Vanderbeck, noting that respondent did not have the records before him at the time of the District Ethics Committee hearing. When the records were recovered, respondent acknowledged the manner in which the funds actually had been disbursed.

As noted above, when the court ordered respondent to forward $500 to Charles Vanderbeck in January 1983, respondent tendered a check that was subsequently returned because the account on which the check was drawn had been closed by the bank. *Supra* at 250. With regard to respondent's misuse of the escrowed $500 and the subsequently dishonored check, respondent's counsel contends that those events were not the result of knowing conduct, but rather the result of improper record-keeping, asserting that respondent believed there were additional funds in his trust account to cover the $500 owed to Charles Vanderbeck.

It is well settled that when an attorney knowingly and without authorization uses a client's money as his or her own, disbarment is the appropriate discipline. *In re Noonan,* 102 *N.J.* 157, 159–60 (1986); *In re Wilson,* 81 *N.J.* 451, 458 (1979). We have recently explained:

> The misappropriation that will trigger automatic disbarment under *In re Wilson,* 81 *N.J.* 451 (1979), disbarment that is "almost invariable," *id.* at 453 consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking. It makes no difference whether the money is used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he ultimately did reimburse the client; nor does it matter that the

pressures on the lawyer to take the money were great or minimal. [*Noonan, supra,* 102 *N.J.* at 159–60]

We expanded the rule of *Wilson* in *In re Hollendonner,* 102 *N.J.* 21, 28–29 (1985). There we stated that a knowing misuse of escrow funds held for a client without authorization will subject the attorney to the disbarment rule:

The parallel between escrow funds and client trust funds is obvious. So akin is the one to the other that henceforth an attorney found to have knowingly misused escrow funds will confront the disbarment rule of *In re Wilson* * * *. [*Hollendonner, supra,* 102 *N.J.* at 28–29.]

Although Charles Vanderbeck did not have an attorney-client relationship with respondent, it is obvious that respondent understood that Mr. Vanderbeck relied on him to forward his share of the award. *See In re Schwartz,* 99 *N.J.* 510, 517 (1985).

There is no doubt that respondent misappropriated [1] a portion of his client's workers' compensation award that was owed to Charles Vanderbeck. The issue that remains is whether that misappropriation was committed "knowingly." With reference to that question, the DRB concluded:

In this case the evidence disclosed [that] respondent simply did not know there were any problems with his trust account. For reasons that will be explored subsequently, respondent had assumed a lackadaisical, almost jaundiced attitude towards the legal profession and his practice. His response, although inappropriate, was to ignore completely all recordkeeping requirements. He did not maintain ledger sheets and rarely reconciled monthly bank statements. This attitude encompassed not only trust account recordkeeping but also his attorney business account, which showed overdrafts at various times every month from December 1981 through November 1982.

When respondent received the proceeds from the workers' compensation action, he testified he fully intended to pay Charles Vanderbeck. However, when he learned his client was in financial need, he instead gave her the money. He testified he then intended to make application to the court for a modification of the divorce judgment to support payment to his client rather than to Charles Vanderbeck. Unfortunately, respondent neglected to follow through and make such an application.

---

[1] We note that application of the *Wilson* disbarment rule to escrow accounts is to be prospective only. *In re Hollendonner, supra,* 102 *N.J.* at 28–29. These events preceded our decision in *Hollendonner.*

In January 1983, respondent was ordered by the court to pay Charles Vanderbeck the $500. He therefore issued a check in that amount drawn on his trust account. It was not until that check was returned for insufficient funds with the notation that the account had been closed that respondent learned the bank had closed his trust account. To respondent's credit he immediately realized that he needed help. He retained an attorney and began psychiatric treatment. Within a month Charles Vanderbeck received his money from respondent's attorney.

Accordingly, the Board finds insufficient evidence to demonstrate clearly and convincingly that respondent knowingly misappropriated any funds. Imposition of the extreme sanction of *In re Wilson, supra,* 81 *N.J.* at 453, would, therefore, be inappropriate. Nonetheless, particularly when considered along with his actions in both the *Infante* and *Ferrara* matters, respondent's conduct warrants severe discipline.

Our assessment of the evidence is consistent with the DRB's conclusion. The evidence establishes respondent's almost total disregard for the requirement that he maintain accurate trust and business account records. Respondent admitted to the District Ethics Committee that he had failed to maintain proper ledger sheets since 1981 or 1982 and that he did not regularly reconcile his accounts. He testified that he was unaware that the bank had closed his trust account in 1983. Based on our independent review of the record, we are unable to conclude that there is clear and convincing proof that respondent knowingly misappropriated escrowed funds for his own use or that he intentionally perpetuated a scheme that would prevent him from knowing whether he was using his own or client's funds. *See In re James,* 112 *N.J.* 580, 591 (1988). Accordingly, we find that respondent failed to maintain business and trust account records. *R.* 1:21-6; *DR* 9-102(C). We further conclude, as did the District Ethics Committee and a majority of the DRB, that the evidence does not clearly and convincingly establish that respondent knowingly misappropriated funds held in escrow in connection with the Vanderbeck matter.

Nevertheless, respondent's conduct in the Vanderbeck matter, together with his actions in both the Infante and Ferrara matters, warrants severe discipline. Respondent entered into contracts of employment but failed to discharge his professional responsibilities and pursue the interests of his clients. Re-

spondent compounded the neglect of his professional obligations by attempting to evade his clients and by refusing to communicate with them. He further compounded his derelictions by deliberately misrepresenting the status of the cases. On several occasions in the course of the Ferrara matter, he lied to Mrs. Ferrara. He falsely informed her that he had filed a complaint and misrepresented that he had retained a California attorney. He also lied about the need to retain a new attorney and falsely told Mrs. Ferrara that there was a potential settlement.

He also lied repeatedly in the course of the Infante matter. He failed to disclose to his clients that the summons and complaint had been dismissed and informed them that the matter could be settled but that a medical report was required. He falsely led his clients to believe that a settlement had been offered and then misrepresented to them that the money would be received forthwith.

It is abundantly clear that respondent's conduct involved "dishonesty, fraud, deceit, and misrepresentation." Respondent's actions adversely reflected on his fitness to practice law. *DR* 1–102(A)(4), (6). Respondent prejudiced his clients by failing to seek their lawful objectives and to carry out his contracts of employment. *DR* 7–101(A)(1), (2), (3). Moreover, respondent's conduct demonstrated an egregious and persistent pattern of neglect. *DR* 6–101.

The DRB and the District Ethics Committee recommended a lengthy term of suspension, taking into account the time served from the temporary suspension beginning January 9, 1984. In determining the appropriate discipline, we note that when respondent recognized his state of affairs, he sought psychiatric help and the assistance of counsel. He voluntarily removed himself from the practice of law in 1983. Before the District Ethics Committee, respondent testified that when he voluntarily ceased to practice law, he took a medical leave from his position as attorney for a local board of education. He further testified

that he was emotionally unable to function as a sole practitioner. According to his psychiatrist, he possessed a passive/aggressive personality disorder, which interfered with his ability to pursue his professional duties and contributed to his evasive pattern of dealing with clients.

We consider these facts in the context of respondent's deceitful conduct and extreme neglect of his clients' interests. On balance, we concur with the recommendation of the DRB that respondent's suspension for more than five years from January 9, 1984, until the present be deemed sufficient discipline. We reiterate that protection of the public, not punishment of the attorney, is the purpose of attorney discipline. *In re Goldstein*, 97 *N.J.* 545, 548 (1984). As a condition of reinstatement, respondent will be required to produce psychiatric evidence of his fitness to practice law. *See In re O'Gorman*, 99 *N.J.* 482, 492; *In re Goldstaub*, 90 *N.J.* 1, 5 (1982). As a further condition of reinstatement, respondent must attend and pass five core classes given by the Institute for Continuing Education; in the event of restoration, respondent shall complete five additional courses within the following year. Furthermore, respondent is to work in association with, and under the supervision of, a practitioner approved by the Office of Attorney Ethics for a period of one year. The precise details of the proctorship are to be approved by that office.

Respondent is ordered to reimburse the Ethics Financial Committee for appropriate administrative costs.

*For Suspension*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

## ORDER

This matter having been presented to the Court on the recommendation of the Disciplinary Review Board that the

discipline to be imposed on JOHN V. GILL of BAYONNE, who was admitted to the bar of this State in 1974, be limited to the time he has served since his temporary suspension from the practice of law on January 9, 1984, and that specified conditions attach to his restoration to the practice of law, and good cause appearing;

It is ORDERED that the suspension of JOHN V. GILL from the practice of law shall continue until further order of the Court; and it is further

ORDERED that as a condition to reinstatement, JOHN V. GILL will be required to submit to the Disciplinary Review Board, psychiatric evidence of fitness to practice law and proofs that he successfully attended five core courses of the Skills Training Course given by the Institute for Continuing Legal Education (ICLE); and it is further

ORDERED that in the event JOHN V. GILL is restored to the practice of law, he shall complete five additional ICLE courses within the following year and he shall work in association with and under the supervision of a practitioner approved by the Office of Attorney Ethics for a period of one year, with the precise details of the proctorship to be approved by the Office of Attorney Ethics; and it is further

ORDERED that respondent is to reimburse the Ethics Financial Committee for appropriate administrative costs.