IN THE MATTER OF FURMAN L. TEMPLETON, JR., AN ATTORNEY AT LAW.

Argued December 11, 1984—Decided June 6, 1985.

*Colette A. Coolbaugh,* Counsel, argued the cause on behalf of the Disciplinary Review Board.

*Michael Critchley* argued the cause for respondent (*Critchley & Roche,* attorneys).

PER CURIAM.

This case arises from a report of the Disciplinary Review Board (DRB or Board) recommending a five-year suspension for multiple instances of misconduct by respondent. The matter came before the Board upon a presentment filed by the District V Ethics Committee (Committee). The presentment included complaints filed by eleven former clients against respondent pertaining to a continuing course of misconduct over a prolonged period. The misconduct encompassed a pattern of neglect of clients, failure properly to represent clients, and failure to communicate with them concerning the status of their cases. The presentment also asserted the failure of respondent to answer or otherwise respond to these complaints, as well as his failure to cooperate with the former Division of Ethics and Professional Services (Division).

The Committee found that respondent was guilty of the charges contained in the presentment. The Committee concluded that respondent had violated *DR* 1–102(A)(6) in that he engaged in conduct that adversely reflected on his fitness to practice law. The Committee also found that respondent had

violated *Rule* 1:21–6 by failing to maintain adequate records of his trust account. It further determined that he failed to answer some of the complaints filed against him, and as to other complaints, failed to answer within the time prescribed. The Committee recommended that respondent's temporary suspension should continue until such time as he made application for reinstatement, and at that time respondent should submit to a psychiatric examination to determine whether he is suffering from any problem that would prevent him from properly representing clients.

Upon a review of the full record, the DRB concluded there was clear and convincing evidence demonstrating respondent's guilt of unethical conduct. As noted, it recommended a five-year suspension subject to certain conditions. We have independently reviewed the record in this case and reach substantially the same conclusion.

## I.

█ Most of the complaints against respondent disclose a pattern of neglect of his clients' legal problems. Some of the complaints against respondent demonstrate a professional neglect of the legal affairs of his clients that reflected a disregard of their welfare:

(1) One such complaint was filed by Irene Calhoun (later remarried under the name of Kirk). She retained respondent to represent her in a divorce action against her husband and paid him $250 to file an 18-month no-fault divorce at a fee arrangement of $40 an hour. She was having difficulty with her husband regarding child support, but respondent failed to send a letter to her former husband as requested. Following an automobile accident the client informed respondent to delay the divorce proceedings because of problems relating to her husband's insurance coverage. After the settlement of her claim for injuries, the client telephoned respondent's office to advise him to proceed with her divorce action because she was planning to remarry; she later met with respondent and told him she wanted the divorce as soon as possible, but respondent never filed the divorce complaint. For almost a year the client telephoned respondent's office every few days, without success. The client, however, having seen respondent only three times, felt she was at least entitled to a refund of $130 from the $250 retainer. Sometime during this period, she did speak with respondent, who apologized and promised that a check for $130

would be mailed to her within three or four days. Finally, approximately two-and-one half years after she had originally engaged respondent, the client terminated his services and retained another attorney who obtained a divorce.

(2) A client, William McCann, retained respondent to represent him with respect to litigation over a franchise agreement. The client paid respondent $500 and thereafter met with respondent three or four times. Later he received a copy of a letter sent by respondent to the parent company disclosing that a settlement had been reached. According to the settlement, the client was to recover $8,750, approximately one-half of his investment, and the company's law suit against the client was to be dismissed. Respondent called the client two months after the settlement and said he would have papers for him to sign. However, the client did not hear from respondent, and when he began experiencing financial difficulties, he commenced telephoning respondent's office once or twice a week; respondent never returned the calls. When, months later, the client did speak with respondent, the latter was "very antagonistic" and told the client not to bother him or his secretary.

Other complaints reflect not only professional neglect, but resulted in the improper refusal to return unearned retainers:

(1) Richard T. Rosengarten retained respondent to obtain a divorce and paid him a $300 retainer. Respondent failed to respond to client's telephone calls, letters and attempts to communicate with him; he performed no services at all. Eventually the Clients' Security Fund awarded to the client the sum of $300, returning the respondent's unearned retainer. After the matter was referred to the Committee, respondent filed an overdue response with the Committee, denying the allegations and maintaining that the client no longer wished a divorce, which the Committee determined was not true.

(2) Jacqueline E. Lynn and Rose Bembry paid respondent $700 toward a retainer of $1,000 to assist Danny Bembry, who was incarcerated in the Essex County jail. Respondent wanted $2,500 for the case and told the two women that he would not see Danny Bembry until he received the full $1,000 retainer. Later respondent went to the home of the two women and told them that a relative of his was in trouble and that he could use the money they owed him. All they had was $150, which he accepted. Thereafter, the two women made numerous attempts to contact respondent, but were unsuccessful. Two weeks after the original retainer, Danny Bembry escaped from the county jail, obviating the need for legal services from respondent. When respondent was informed of this, he refused to refund any of the money to the two women. Complainants then filed a complaint against respondent, seeking a return of the retainer they had given him. Respondent contended that he had explained to his clients that the retainer was not refundable, which they denied; they also challenged a statement by respondent that he had seen Danny Bembry in the county jail. The Clients' Security Fund credited the complainants' version, concluding that respondent had not earned a retainer, and awarded the complainants $850.00.

Other instances of neglect by respondent of clients' legal matters resulted in legal injury to his clients:

(1) Pearl Hoffman and her husband retained respondent on a contingency fee basis to represent Mrs. Hoffman in a personal injury suit against a hospital for injuries she suffered when she fell on the steps of the hospital. Respondent assured her that a complaint for her injuries would be filed. Several months later, respondent informed her that the insurance company would be contacting her to settle the case, but that she should not accept the offer and should refer the insurance company to him. The client attempted to contact respondent without success; she left messages with the answering service, with respondent's secretary, and sent registered letters, but respondent never contacted her. More than three years after respondent had been retained, the client hired another attorney. Through this attorney Mrs. Hoffman filed a malpractice suit against respondent and eventually obtained a judgment by default for $60,390. When the Committee inquired into this matter, respondent claimed but could not verify that he had "filed a complaint within the applicable limitations" on behalf of his client.

(2) In another matter, respondent had been retained by Joseph Hannon to represent him in a civil action. Answers to interrogatories were not answered, which resulted in Mr. Hannon's defenses being suppressed and a default judgment for $7,500. Respondent contacted Mr. Hannon who, at this time, was residing in California and informed him that if he acquiesced in the $7,500 judgment, respondent would give him a promissory note for $2,500. Mr. Hannon sent the settlement check to his father-in-law, Harold Reiter, who personally delivered the check to respondent to be forwarded to plaintiff's attorney. When Mr. Reiter asked respondent why he would give his son-in-law $2,500, respondent replied that he felt it was the right thing to do. Mr. Reiter concluded that respondent realized that the default judgment was his fault. When Mr. Reiter asked respondent for the promissory note, respondent said he would give this note when he received the release from plaintiff's attorney. Mr. Reiter never received either document and Mr. Reiter's subsequent attempts to contact respondent were unavailing. Telephone messages were unanswered. Finally, he sent respondent a registered letter stating that if he did not receive the release within 24 hours, he would write to the Committee. Respondent never replied and Mr. Reiter filed an ethics complaint.

(3) Also in this category is the complaint of Delilah Dunn, who retained respondent to represent her in a medical malpractice suit against her doctor on a contingency fee basis. Mrs. Dunn had met with respondent for two hours and was told to prepare a listing of all the treatment and medication her doctor had prescribed. When she completed this, she returned to Respondent's office and conferred with him. He told her he would review the material and promised to contact her neurologist. She later discovered in a conversation with that doctor that respondent never contacted him. When Mrs. Dunn did not hear further from respondent she began writing letters and calling him on the telephone, both day and evening, leaving messages that were not answered. She contacted another law firm for advice, but that firm, too, was unsuccessful

in contacting respondent. At some point, respondent telephoned her and said he had been too busy to return her calls. Mrs. Dunn then sent a registered letter to respondent reminding him that it would be two years since he had accepted her case, complaining that it was difficult to believe that during that period of time he had not given her any of his time, or answered her letters or telephone calls, asking him to explain his actions and to let her know if they had a "calendar date" so that her action would be protected. She never received a reply to this letter. Ultimately, Mrs. Dunn filed a complaint with the Committee; respondent filed an answer. In her testimony before the Committee, Mrs. Dunn disputed his statement that a recovery was not expected, or that he had advised her to contact other attorneys; she said he repeatedly told her that she had a good case. She also stated that respondent never returned her file to her and, by the date of the Committee hearing the statute of limitations on her medical malpractice action had run.

A further example of neglect and poor communications with clients is the complaint of Phillips. Respondent was retained by members of the Phillips family to assist in a postconviction relief application for two brothers who were serving sentences at the Rahway Correctional Facility. Respondent, however, did not meet with the two brothers until after family members complained about the way he was handling the case. When, four months after being retained, respondent met with them, he stated that he had to research their prior criminal proceedings and promised to return within two weeks and advise them. Following a complaint to the Committee, respondent claimed that there was a disagreement over the terms of the retainer, and, further, that he had invested considerable time in advising his clients.

Respondent also became involved in personal matters that reflected adversely on his general character and fitness:

(1) At respondent's request, Yvonne Minor, a court interpreter, translated some French documents into English, pertaining to the exploitation of oil in Africa. Mrs. Minor completed the translation and gave the documents to respondent. She later received a telephone call from respondent advising that the work was very satisfactory. Although she submitted her invoice for $280, she was not paid. In her attempts to collect this money from respondent, she telephoned his office more than 100 times. When she spoke with respondent, he acknowledged the debt and frequently told her that the check had been prepared and would be mailed soon. The obligation was never paid.

(2) Respondent had entered into an agreement with Magna Enterprises, Inc. (Magna) for the purchase of diamonds for $24,427.75. Respondent delivered to

Magna a promissory note but the note was dishonored. Magna later filed suit against respondent and obtained a default judgment for $25,956.95 against him. A complaint was filed with the Committee against respondent on behalf of the company alleging that respondent used his professional knowledge to avoid service of process. Respondent belatedly answered, denying the allegations. Moreover, he asserted that he was only an agent in fact for the disclosed principal, who was actually responsible for the debt.

The DRB concluded that respondent failed to carry out contracts of employment, *DR* 7–101(A)(2), and misrepresented the status of cases to clients, *DR* 1–102(A)(4). Respondent's conduct also violated *DR* 6–101 in that he exhibited a "pattern of negligence or neglect in his handling of legal matters."

The DRB also emphasized respondent's failure to cooperate with the Committee investigating the complaints against him in that he refused to appear and testify at the formal hearings. The DRB further stressed that a complaint filed by the Division alleged that respondent failed to file answers to numerous ethics complaints, including the *Lynn, Magna Company, Hoffman, Dunn, Minor,* and *Kirk* matters, as well as another complaint by a person named Ingram. The Division's own complaints served on the respondent also went unanswered. In addition, the Committee, while dismissing on the merits a complaint of alleged verbal abuse by respondent with respect to one Edith Gluck, observed in that matter the continuing pattern of respondent's failure to cooperate with the Committee.

The DRB noted particularly that the Division had also filed a complaint detailing respondent's failure to cooperate with an audit of his attorney's books and records. When respondent finally met with an auditor for the Division, he did not produce any records at that time, claiming he could not obtain the records because of a landlord-tenant dispute that locked him out of his office. He promised to deliver them to Trenton, but did not keep this promise. ·When respondent met again with an auditor, he admitted that his books and records were not maintained in compliance with *Rule* 1:21–6. He produced some noncurrent trust and operating account records. At another meeting respondent arrived late and did not produce any fur-

ther books or records. Respondent never fully complied with the demand for his books and records. As a result of respondent's failure to cooperate with the audit of his account, he was temporarily suspended from the practice of law on July 28, 1980, and the temporary suspension has remained in effect throughout these proceedings.

## II.

Respondent has essentially conceded the eleven instances of misconduct. He also acknowledges his failure to respond suitably to the complaints that were filed against him and to cooperate with the Division in these proceedings. We must now evaluate the gravity of respondent's ethical transgression to assess appropriate discipline.

Respondent sought to excuse his misconduct because of his relative inexperience and the pressures of being a sole practitioner. Respondent had been admitted to the Bar in 1966 and held various governmental positions. His professional derelictions surfaced in 1975, about one year after he entered the practice of law as a sole practitioner. The DRB found, however, that the pressure of business cannot be permitted to diminish an attorney's responsibility to his client. We agree with the DRB that respondent did not "measure up to the high standards of responsibility required of every member of the profession."

Further, respondent cannot claim to have been so inexperienced in 1975 as to be unable to understand the ethical ramifications of his conduct. Moreover, the ethical violations did not occur suddenly or in isolation. Consequently the wholesale breach of professional ethics cannot be attributed only or primarily to a lack of experience or professional naivete.

Respondent also has maintained that he sought no advantage from his misrepresentations. However, in several instances he kept retainers that he had not earned. The record discloses, without further elaboration, that the Clients' Security Fund has

reimbursed $9,150 to six former clients of respondent, refunding wholly unearned retainers.

Furthermore, while respondent may not have sought any significant personal gain from his mishandling of clients' matters, several of his clients suffered legal detriment and financial losses as a result of his derelictions. There was harm even in the absence of personal gain by respondent, evidenced in part by the substantial civil judgments based on malpractice obtained against respondent by former clients. Thus, the resulting financial and legal hardships inflicted on several of respondent's clients cannot be minimized.

In addition, respondent displayed an indifference to the justice system in his failure to confront the ethics charges when complaints were filed and in his lack of cooperation in the investigations and hearings. His failure to file any, or timely, answers is a further reflection of an attitude that is inconsistent with the professional obligations of an ethical attorney. In this vein, the DRB found even more disturbing respondent's lack of cooperation with the Division. As noted, he was requested to produce his books and records. Initially, he did not produce them, but finally produced some noncurrent and inadequate records.

The DRB apparently believed that respondent's ethical failures were extremely serious. It drew a parallel between respondent and the respondent in *In re Netchert*, 78 *N.J.* 445 (1979), from which it quoted the following:

> We are not confronted here with a single instance of aberrational conduct. Rather, what emerges is a pattern of abandonment of clients, casting adrift of professional responsibilities, neglect of practice, violations of fundamental disciplinary rules governing the practice of law, and contumacious and repeated failure to co-operate with the enforcement of those disciplinary rules. [*Id.* at 453]

In all disciplinary cases, we have felt constrained as a matter of fairness to the public, to the charged attorney, and to the justice system, to search diligently for some credible reason other than professional and personal immorality that could

serve to explain, and perhaps extenuate, egregious misconduct. We have always permitted a charged attorney to show, if at all possible, that the root of the transgressions is not intractable dishonesty, venality, immorality, or incompetence. We generally acknowledge the possibility that the determinative cause of wrongdoing might be some mental, emotional, or psychological state or medical condition that is not obvious and, if present, could be corrected through treatment. An inquiry into such possible causes of ethical misconduct not only can be instructive and enlightening, it may also hold the promise of a resolution of the disciplinary charges in terms of personal rehabilitation, which will serve to protect the public interest without ruining a lawyer's career and life. To that end, in this case the DRB ordered an independent psychiatric evaluation of respondent.

The psychiatric evaluation does not provide us with a plausible explanation for respondent's transgressions. The psychiatrist concluded that respondent was presently competent and that "no disabling psychoneurosis currently exists." However, as noted by the DRB, there is a paucity of information in the report about the state of respondent's mental health during the several years that respondent engaged in misconduct. Indeed, his two interviews with the DRB-appointed psychiatrist failed to illuminate the area, a failure that, according to DRB, must be attributed primarily to the attitude of respondent. Moreover, the psychiatric defense offered by respondent did not seek to demonstrate "that respondent suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful." *In re Jacob*, 95 *N.J.* 132, 137 (1984).

We seek through appropriate discipline to protect the public from the attorney who does not and cannot meet the standards of responsibility of every member of the profession. *In re Goldstaub*, 90 *N.J.* 1, 5 (1982). As noted, the Board here recommended that respondent be suspended from the practice of law for a period of five years retroactive to the date of his continued temporary suspension on September 9, 1980. It was

persuaded that the mitigating factors called for discipline less than disbarment. It mentioned that (1) no new complaints have been filed against respondent either with the Committee or the Clients' Security Fund; (2) respondent had no prior ethical problems until this series of complaints were filed; (3) his career as an attorney in public service was honorable and he had a good reputation; (4) respondent is remorseful and has admitted to the Board that his conduct transgressed the rules; (5) although the Clients' Security Fund has paid money to clients on his behalf, the awards were based upon his total failure to carry out his contracts of employment rather than intentional misappropriation of trust funds; (6) while it is clearly unethical for a lawyer to accept retainers under circumstances "such that the services for which fees were advanced will not be performed by him," the conduct in this case does not equate to intentional misappropriation, (citing *In re Stern*, 92 *N.J.* 611, 619 (1983)); respondent's actions were not willfully deceitful or fraudulent; (7) despite his failure to produce adequate books and records, no evidence of misappropriation of client trust monies has ever arisen in this matter; (8) respondent has complied with his temporary suspension for the four years preceding the DRB hearing and has not practiced law; and (9) the misconduct occurred during the period when respondent attempted for the first time to engage in private practice.

We are not particularly impressed by the circumstances that respondent was just entering into the private practice of law and that he is now remorseful, particularly in light of his earlier admission to the bar, the prolonged pattern of misconduct, and the absence of plausible psychiatric or similar explanation for his misconduct. We are only minimally assuaged that respondent honored his suspension and that no new complaints against him have surfaced. Compare *In re Goldstein*, 97 *N.J.* 545 (1984). We are relieved that respondent's misconduct did not reach more egregious levels, involving the misappropriation of trust funds or willfully deceitful or fraudulent retention of

moneys due clients. Consequently, we do not attribute great weight or significance to these mitigating factors.

■ We must, nevertheless, consider whether in the totality of the circumstances respondent has demonstrated that his ethical deficiencies are intractable and irremediable. In some instances, underlying misconduct itself constitutes irrefutable evidence of a profound lack of professional good character and fitness. *E.g. In re Goldstein, supra* (inability to discharge professional responsibility and to conform to judicial direction); *In re Friedland,* 95 *N.J.* 170 (1984) (conviction for commission of serious crimes); *In re Hughes,* 90 *N.J.* 32, 37 (1982) (commission of crimes, such as bribery that undermine the administration of justice); *In re Wilson,* 81 *N.J.* 451 (1979) (intentional misappropriation of client's moneys); *In re Netchert, supra,* (chronic failure to represent clients and to adhere to professional standards). In considering the Board's analysis and reasoning in this case, we remain mindful that the purpose of discipline is not to punish the offender but to protect the public.

■ In this case, we conclude, with some added observations, that a *de facto* suspension for a five-year period is appropriate to protect the public interest. A suspension of this duration is unusual and, because of its severity, it has been compared to disbarment. *See In re Friedland,* 92 *N.J.* 107 (1983); *In re Strickland,* 87 *N.J.* 575 (1981). We recognize, however, that it does not accomplish what disbarment does. Disbarment is reserved for the case in which the misconduct of an attorney is so immoral, venal, corrupt or criminal as to destroy totally any vestige of confidence that the individual could ever again practice in conformity with the standards of the profession. Disbarment is a guarantee to the public that the attorney will not return to the profession.

With respect to this respondent, the evidence leaves us slightly short of a conviction that the ethical violations mirror an unsalvageable professional character. We are not convinced that respondent's good character and fitness have been perma-

nently or irretrievably lost. We must concede that in these circumstances our conclusion as to the quality of personal and professional fault, and the lack of good character and fitness, as these bear on appropriate discipline, entails a prognostication. It is necessary, therefore, to hedge our determination as to proper discipline by affixing stringent conditions to preserve public confidence and to account for the possibility that we may be misjudging respondent.

Accordingly, we require that prior to any readmission to practice, respondent again should be evaluated psychiatrically as to his continued mental and emotional stability; he must cooperate fully in connection with such an examination. Furthermore, he will be obliged to continue any course of psychiatric counselling that may be recommended for as long as necessary. Respondent's readmission shall also be contingent upon his making full restitution to the Clients' Security Fund. Finally, any restoration to practice is conditioned upon respondent's working in a supervised capacity until otherwise ordered by the Board upon a suitable application. We state further that these conditions for restoration to practice shall be considered continuing obligations. If any of these is violated, or if respondent commits any further ethical breaches, such as were the subject of these proceedings, this would be virtually dispositive evidence that respondent has indeed gone beyond the pale of professional rehabilitation. It would impel the conclusion that we misjudged respondent as to his capacity for rehabilitation and that we were wrong in our appraisal of his basic character and fitness to practice law. That circumstance would justify disbarment.

We further order that respondent reimburse the Ethics Financial Committee for appropriate costs, including production of transcripts.

*For suspension*—Justices CLIFFORD, HANDLER, POL-LOCK, O'HERN and GARIBALDI—5.

*Opposed*—None.

## ORDER

It is ORDERED that FURMAN L. TEMPLETON, JR., of EAST ORANGE, admitted to the bar of this State in 1966, be suspended from the practice of law for a period of five years and until the further Order of this Court, retroactive to September 9, 1980; and it is further

ORDERED that prior to any restoration to practice, respondent must:

1. be evaluated psychiatrically as to his continued mental and emotional stability;

2. cooperate fully with such examination;

3. continue any course of psychiatric counselling that might be recommended for as long as may be necessary; and

4. make full restitution to the Clients' Security Fund; and it is further

ORDERED that respondent's restoration shall be conditioned upon his working in a supervised capacity until otherwise ordered by the Disciplinary Review Board upon a suitable application; and it is further

ORDERED that the obligation to meet the conditions for respondent's restoration to practice shall be ongoing; and it is further

ORDERED that the restraint against respondent practicing law is hereby continued for the period he remains under suspension; and it is further

ORDERED that respondent comply fully with Regulation 23 of the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate costs, including the production of transcripts.