IN THE MATTER OF ANTHONY J. LASALA, AN
ATTORNEY AT LAW.

May 6, 1986.

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that ANTHONY J. LaSALA, of WAYNE, who was admitted to the Bar of this State in 1965, be publicly reprimanded for conduct adversely reflecting on his fitness to practice law, *DR* 1–102(A)(6), and for accepting employment when his professional judgment was affected by his own financial, business or personal interest, *DR* 5–101(A) and *DR* 5–105(B), and good cause appearing;

It is ORDERED that the findings of the Disciplinary Review Board are hereby adopted and respondent is publicly reprimanded; and it is further

ORDERED that the Decision and Recommendation of the Disciplinary Review Board, together with this order and the full record of the matter, be added as a permanent part of the file of said ANTHONY J. LaSALA as an attorney at law of the State of New Jersey; and it is further

ORDERED that ANTHONY J. LaSALA reimburse the Ethics Financial Committee for appropriate administrative costs.

*Decision and Recommendation of the*
*Disciplinary Review Board*

This matter is before the Board based upon a Presentment filed by the District IIA (Bergen County) Ethics Committee recommending that Respondent be publicly reprimanded. The Board makes the following findings of fact:

Respondent was retained to form a partnership and corporation for the purchase of Hickory Hill Country Club, Totowa, New Jersey, by Joseph Doney, John D. DeStefano, Anthony Reiter, Joseph Fazio and William Farkas, who is Respondent's brother-in-law. The club was purchased on June 10, 1975 for $1,150,000, with the purchaser taking back a $1,000,000 mortgage. Doney, an experienced club manager, was to operate the club. The others did not take an active role in the club management.

In August 1975 the principal of the realty company holding the purchase money mortgage died. Since the estate was in need of immediate cash, the executor and trustee of the estate offered to sell the mortgage at a discount. The executor contacted everyone he believed could purchase a mortgage of this amount. Initially, he offered to discount the mortgage to $750,000 but later reduced it to $650,000. Respondent was contacted by this executor as representative of the mortgagors since it would be to their advantage to obtain this discount.

The executor believed he asked Respondent to inquire about any other prospective purchaser. Doney expressed an interest to the executor in purchasing the mortgage. Doney and DeStefano asked Respondent if he knew of any one willing to invest in the club. They also told Respondent they would try to obtain the necessary funds themselves. Respondent replied that he would make inquiries.

Throughout 1975, the country club was operating with cash deficits. A financial forecast submitted by the club's accounting firm on August 6, 1975 projected a monthly cash flow deficit of about $14,000. By early 1976, the financial situation did not improve. The partnership became divided as a result of this and other management problems.

In either late January or early February 1976, Respondent introduced Joseph Coyle as a business partner of his who had a proposition to present to the club partners. Respondent told the club partners that he could not legally advise them about the proposition because of his business relationship with Coyle. Respondent then left. Coyle offered to obtain the needed capital by locating investors in exchange for 20 to 25 percent of the club stock as his finder's fee. According to club partner Fazio, it was well known that Respondent would have an interest in this business venture with Coyle. Except for Doney and DeStefano, the other partners were agreeable to this proposition. Doney and DeStefano later maintained that Respondent did not disclose at that meeting that he and Coyle were business partners. The proposal was not accepted.

On February 16, 1976 the club partners met to discuss their bleak financial situation. Based on their accountant's cash flow projections, the partnership would not be able to meet the May mortgage payment. The monthly mortgage payments were $4,500 with a balloon payment in May of $53,500. In June and the following months it would decrease to $3,000. The partners rejected short term financing and purchasing the mortgage themselves because of their financial situation. The partners

concluded that they needed to find someone to purchase the mortgage who had no interest in acquiring the club should there be a default in the payments. In response to Fazio's suggestion that Respondent buy the mortgage, Respondent replied that another business partner of his whom he identified as Joseph D'Amario might be interested. D'Amario, accompanied by Coyle, later inspected the club premises. Except for Doney and DeStefano, all club partners later testified in the Superior Court they knew that Respondent and D'Amario were business partners. To the contrary, Doney and DeStefano denied Respondent was at the meeting or that D'Amario's name had been mentioned. It is clear Respondent did not at that time inform the partners that he was going to buy the mortgage or be part of the purchase of it.

By letter dated February 19, 1976, Respondent advised all the club partners that

certain events have occured, [sic] which in my opinion are a breach of your agreements and contrary to law, and I strongly suggest that you all obtain independent legal advice, since I cannot represent any one of you because of my obvious conflict of interest.

The letter also stated:

In my opinion, it is business insanity for any one of you to borrow money on a corporation basis which will be payable in 90 days, when it is clear to all of you that in 90 days you will not be in a position to pay off the $30,000. In fact, it is clear to all of you that in 90 days you will have to come up with an additional $50,000. In my opinion, for the corporation to borrow money might constitute a fraud on the bank. It must be understood that if the corporation fails to pay the loan, the bank can go after any one of guarantors for the *entire* loan of the loan.

The professional relationship among the partners deteriorated to such an extent that they could no longer operate the business together. By letter dated March 15, 1976, an attorney on behalf of Doney and DeStefano suggested to Respondent that the only responsible solution would be for the three other stockholders to sell out to his clients. On April 2, 1976 Doney and DeStefano met with another attorney to discuss the possibility of purchasing the country club mortgage. At that meeting the attorney was informed Respondent was representing

persons who were going to acquire the mortgage. The attorney then began negotiating with a bank in an attempt to get a loan commitment.

By letter dated April 6, 1976, Respondent informed Doney he no longer represented the corporation and partnership and suggested Doney file with the Secretary of State a certificate of change of registered agent. Respondent forwarded to the mortgage holder a contract signed by D'Amario dated April 9, 1976 for the purchase of the mortgage accompanied with a $5,000 deposit. On the same day the mortgage holder received this check, he received a telephone call from Doney or DeStefano indicating they were prepared to buy the mortgage. When the mortgagee stated that he had just signed a contract, the caller expressed anger with Respondent and maintained he was double-crossed.

Although Doney and DeStefano had not filed a formal application for a bank loan, a bank did express interest in their proposal. They did not tell their fellow partners about this tentative loan commitment since those partners had agreed to sell their business interests. They also did not inform Respondent. In June 1976 they obtained a $50,000 bank loan against the corporation to buy out their partners. Their attorney was continuing his efforts to obtain a bank loan for them in the hope that the Superior Court would hold that their offer of $675,000 should be accepted over the $650,000 which the executor of the estate accepted from D'Amario. The court action to approve the mortgage sale was initiated by the executor since some of the beneficiaries of the estate were infants. The court later declined to rule on this contract issue.

When D'Amario entered into the contract to buy the country club, he anticipated having others join him. Although he did not have an agreement with Respondent, he assumed Respondent would be a partner in this transaction. Respondent had expressed an interest in participating in this purchase but maintained nothing came from it. He, nevertheless, represent-

ed to the bank that he was to be one of the borrowers. D'Amario interested two friends of his to become partners in this matter with each acquiring a 25 percent interest.

D'Amario knew that Doney was not pleased with Respondent about this purchase. Respondent was concerned about Doney's accusation against him because he felt he had followed instructions to find a buyer for the mortgage. Respondent told D'Amario that he "could no longer be involved either as principal or as attorney" for D'Amario. Respondent suggested that D'Amario obtain another attorney. Respondent, too, retained an attorney to represent him. At Respondent's request, D'Amario agreed to forego this venture and offered to convey it to Doney and DeStefano for $675,000.

On August 20, 1976 Doney and DeStefano obtained a one million dollar bank loan commitment. However, they never formally accepted this by paying the $4,000 commitment fee within the 45-day time period. They did not inform anyone about this commitment. The attorney representing Doney and DeStefano informed the estate executor by letter dated September 20, 1976 that his clients' firm offer was $675,000. That attorney in early December 1976 informed the interested parties that his clients were no longer able to acquire the mortgage and for D'Amario to proceed with the closing. The closing with D'Amario took place on December 30, 1976.

In 1977 D'Amario complained to Respondent that Respondent got him involved in this business venture to save Respondent's brother-in-law, who was no longer involved in the business. According to Respondent, D'Amario was concerned about the financing arrangement and wanted to lessen his financial exposure. D'Amario offered Respondent and Coyle 50 percent of his half interest in Hickory Hill. Coyle, Respondent's partner in Media Capital, saw no reason why Media Capital should not participate. According to Respondent, the reasons for this position were that Doney and DeStefano did not accept the offer to purchase the mortgage, they were making the mort-

gage payments and they had signed an agreement acknowledging they had no defenses against the sale of the mortgage. Respondent agreed to the investment believing that the problem with Doney was at an end. An agreement was entered into on July 1, 1977 by D'Amario, Coyle and Respondent. According to this agreement, Media Capital acquired two-thirds of D'Amario's interest in the country club which gave this partnership a one-third interest in the entire joint venture.

On May 15, 1978 Doney and DeStefano, individually and as partners, filed a civil action to reduce their mortgage obligation from the $1,000,000 face value to the $650,000 discount purchase price. In their complaint, they asserted that Respondent interfered with their opportunity to purchase the mortgage at that price. Following a lengthy trial, the trial court on January 22, 1980 held that Doney and DeStefano had proved that Respondent's "activities constituted a tortious interference with their prospective economic advantage." However, the trial court said there was no causal connection between Respondent's interference and the alleged financial injury. The court said that the activities of these two partners in failing to perfect the mortgage commitment was the reason they could not complete the transaction. Concerning Respondent's participation in this matter, the court found

> that his actions clearly placed him in a conflict position among his several clients. Not only did he have a duty to the plaintiffs which I find he breached in not removing himself from representing all of the clients, but he chose to participate in the transactions.... This, in my opinion, is clearly a breach of the duty he owed to his former clients [1T10–8 to 20].*

The trial court held that Respondent had been unjustly enriched to the extent of any benefit he gained as a result of his conduct and assessed damages against Respondent in an amount equal to the interest Respondent had in the mortgage plus costs. The Appellate Division later modified the judgment

---

*1T refers to the transcript dated January 22, 1980 of the trial court's ruling.

to reflect that damages be only the profit Respondent received from the transaction.

On May 11, 1984, a formal ethics complaint was filed against Respondent. The hearing panel concluded that Respondent's conduct violated his fiduciary responsibility to his clients, that he gained a personal advantage adverse to his clients' interest and caused them irreparable damage. The panel recommended that Respondent be publicly reprimanded.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Ethics Committee in finding unethical conduct on the part of Respondent are supported by clear and convincing evidence.

An independent review of the entire record supports the conclusion that Respondent, privy to confidential financial information of his clients, used that information to his advantage. He knew that his five clients who purchased a country club were in financial difficulty and undoubtly would not be able to meet a balloon mortgage payment due shortly. Purchasing the country club mortgage at a substantial discount would result in a windfall for the new mortgage owners.

Accepting as a fact that Respondent orally informed his five clients that a business associate of his might be interested in buying the club's mortgage, this statement was inadequate. Respondent withdrew as an attorney for the corporation only days before his business associate made a deposit to buy the club's mortgage. That incident quickly followed a letter dated February 19, 1976 in which Respondent discouraged any attempt by the individual partners to borrow additional funds. At no time did Respondent in writing advise his clients of his efforts to obtain a purchaser of the mortgage. This factor becomes significant in view of the fact that the partners were fragmentized over management of the club. Although Respondent divorced himself from the purchase and part ownership of

the mortgage when Doney complained, this could be perceived as a maneuver to delay his participation in the apparent hope that Doney would no longer object to his acquisition of an interest in the country club's mortgage.

■■■ Respondent's conduct in this matter must be considered objectively and not subjectively. *In re Makowski*, 73 *N.J.* 265, 270 (1977). The conduct must be viewed from the perspective of an informed and concerned private citizen to determine whether the reputation of the bar would be lowered if the conduct were permitted. *In re Opinion No. 415*, 81 *N.J.* 318, 325 (1979). Respondent's conduct reflected adversely on the reputation of the legal profession. Regardless of Respondent's motives, his conduct in this transaction leads to only one logical conclusion: he attempted to obtain a personal profit at the expense of his clients. His explanation that he was only trying to help these clients by having his business associate acquire the mortgage cannot dispel that conclusion.

"An attorney does not discard his professional standing and obligation to maintain a high standard of conduct when he engages in a business transaction." *In re Ryan*, 66 *N.J.* 147, 150 (1974). In *Ryan* there was no attorney-client relationship but the complainant expected that attorney to prepare a contract of sale for the purchase of land. Instead, Ryan, without informing the complainant, submitted a higher bid and acquired the property. The court concluded that that attorney's conduct "fell far short of the high standards expected of him." *Ibid.*

"Even if an attorney lacks bad intentions, he should not become involved in a situation where his personal interests conflict with those of his client." *Matter of Nichols*, 95 *N.J.* 126, 131 (1984). An attorney-client relationship requires that the client have the utmost confidence in the attorney and that the attorney will not use gained knowledge to the client's disadvantage. See *Matter of Nichols, supra,* at 131; *In re Gavel*, 22 *N.J.* 248, 262 (1956).

The Board concludes that Respondent's conduct adversely reflected on his fitness to practice law, *DR* 1 102–(A)(6), and that he accepted employment where his professional judgment was affected by his own financial, business or personal interest, *DR* 5–101(A) and *DR* 5–105(B).

In assessing the appropriate discipline, the Board is mindful that the purpose of discipline is to protect the public from the attorney who does not meet the standards of responsibility of every member of the profession. *Matter of Templeton*, 99 *N.J.* 365, 374 (1985); *In re Goldstaub*, 90 *N.J.* 1, 5 (1982).

Respondent has been a member of the bar since 1965. He should have been aware of his responsibilities to his clients and his profession. Respondent was privately reprimanded in 1978. In mitigation, Respondent's clients were not directly injured since they could not acquire the mortgage. Respondent has acknowledged that his conduct was improper and that he would not, if faced with a similar situation, again act in the way he did.

Based on the totality of the circumstances, a five-member majority of the Board finds Respondent was in an actual conflict of interest and recommends he be publicly reprimanded. Three members recommend a private reprimand based upon an admitted appearance of conflict. One member abstained.

The Board further recommends Respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.