583 A.2d 1122

IN THE MATTER OF DENISE A. ASHLEY, AN
ATTORNEY AT LAW.

January 10, 1991.

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that DENISE A. ASHLEY of CAMDEN, who was admitted to the Bar of this State in 1984, be suspended from the practice of law for a period of two years and that any application by respondent for reinstatement to practice be subject to conditions,

And the Disciplinary Review Board having further recommended that respondent's reinstatement to the practice of law

be conditioned by the requirement that she practice under a proctorship for one year,

And the Disciplinary Review Board's recommendation being based on its determination that respondent 1) acted with gross negligence in a number of matters, contrary to *RPC* 1.1(a); 2) exhibited a pattern of negligence, contrary to *RPC* 1.1(b); 3) failed to represent diligently or to communicate with her clients, and failed to cooperate with the ethics authorities, contrary to *RPC* 1.3, *RPC* 1.4 and *RPC* 8.1(b),

And good cause appearing;

It is ORDERED that the findings of the Disciplinary Review Board are hereby adopted and DENISE A. ASHLEY is suspended from the practice of law for a period of two years and until further order of the Court, effective January 8, 1991; and it is further

ORDERED that respondent's reinstatement to the practice of law is conditioned on the requirement that she submit, as part of any application she may make, psychiatric proofs that she is fit to return to the practice of law and proof of her successful completion of the Skills and Methods core courses and the Professional Responsibility course offered by the Institute for Continuing Legal Education; and it is further

ORDERED that in the event respondent is reinstated to the practice of law, her reinstatement is further conditioned by the requirement that she practice under a proctorship for one year, pursuant to Administrative Guideline No. 28; and it is further

ORDERED that the Decision and Recommendation of the Disciplinary Review Board, together with this Order and the full record of the matter, be added as a permanent part of the file of said DENISE A. ASHLEY as an attorney at law of the State of New Jersey; and it is further

ORDERED that DENISE A. ASHLEY be and hereby is restrained and enjoined from practicing law during the period of her suspension; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.

## APPENDIX

This matter is before the Board based upon two presentments filed by the District IV Ethics Committee.

Respondent was admitted as a member of the Bar of New Jersey in 1984. She was engaged in a sole practice in Camden, New Jersey, until January 12, 1989, when a consent order was entered placing respondent on disability inactive status.

Respondent was charged with neglect in ten matters, as well as misrepresentation to clients, refusal to return files, and lack of cooperation with the ethics system. In addition, respondent did not return two retainers, as ordered by the Bankruptcy Court, and was charged with three instances of fraudulently signing her clients' signatures to bankruptcy petitions. The specific facts are as follows:

*DRB 88–286*

### HENRY MATTER (IV–87–30E)

Respondent was retained in September 1984, to represent Mary Henry (grievant), in a bankruptcy proceeding. Grievant paid respondent $600 initially (C30E–1 in evidence) and provided a list of assets and debts to respondent to assist her in filing a Chapter 13 petition. In November 1984, grievant again contacted respondent, after a sheriff came to her home with papers for a forced sale of the property. Respondent assured her client that she would take care of it, and not to worry, that her home would not be sold (1T13–14)[1]. In fact, the house was sold at a

---

[1] 1T refers to the transcript of the hearing on May 5, 1988 before the District IV Ethics Committee.

sheriff's sale. Grievant then retained another attorney to file a civil suit against respondent, which was settled for $3,000 (1T18–19, 21).

The committee found a pattern of negligence, considering this matter along with the other matters in the presentment, in violation of *RPC* 1.1(b); gross neglect, in violation of *RPC* 1.1(a); lack of diligence, in violation of *RPC* 1.3; lack of communication, in violation of *RPC* 1.4; and failure to provide a formal answer to the complaint or to cooperate with the investigator, in violation of *RPC* 8.4(d).[2] The committee found identical violations for all the matters considered in this presentment and, in addition, violations of *RPC* 1.4 due to respondent's signing her clients' signature to bankruptcy petitions without their consent in both the *Connell* and *Geserick* matters (*infra*).

## CONNELL, ALESHIRE & GESERICK MATTERS (IV–87–31E)

The following three bankruptcy matters were brought to the attention of the committee by Bankruptcy Court Judge Wizmer.

James Connell and his wife retained respondent to represent them in a bankruptcy proceeding in October 1985. Respondent filed two Chapter 13 petitions, which were both dismissed for lack of prosecution. The Connells consistently had a hard time reaching respondent to obtain information. When the Connells met with a trustee concerning a third petition, they learned for the first time that this third petition was a Chapter 7 proceeding, rather than a Chapter 13 proceeding. Both Mr. Connell and his wife indicated that their signatures on this third petition were forged (1T28–29). Respondent admitted she signed the

---

[2]Although the committee cited *RPC* 8.4(d) for failure to file an answer to the complaint, *RPC* 8.4(d) deals with prejudice to the administration of justice. *RPC* 8.1(b) is the correct rule for failure to cooperate with disciplinary authorities.

petition for the Connells, but stated it was done with their permission (2T31–33).[3]

Judge Wizmer ordered respondent to refund the retainer to the Connells, which has not been done by respondent (C31E–1 in evidence, 2T30).

Charles Geserick retained respondent to file a bankruptcy petition for his business. Just before his court date, his wife died and he requested respondent contact the bankruptcy court to request a second hearing date. Respondent did not follow through with this request with the bankruptcy court. On August 10, 1987, Judge Wizmer dismissed the matter and ordered that respondent return the retainer to Geserick. Respondent has not returned the retainer (C31E–11 in evidence). In addition, Judge Wizmer found that respondent forged her client's signatures on the bankruptcy petition.

The final grievant referred by Judge Wizmer was William Aleshire. Aleshire first retained respondent in December 1985, and paid a $250 retainer to have respondent file a bankruptcy petition. Grievant's car was repossessed and grievant appeared three times in bankruptcy court without respondent making an appearance. At the last hearing, Judge Wizmer again ordered the retainer returned, as respondent had not performed the requested legal services. Respondent has returned this retainer (2T8).

WATKINS MATTER (IV–87–33E)

On January 7, 1986, Patrick Watkins and his wife took a Chapter 13 petition to respondent's office. They paid $310 to cover both a retainer and filing fee, after which they received a court date of March 3, 1986. Grievants appeared at Court on the appointed day, but respondent did not appear (1T49). The case was dismissed on March 7, 1986, even though respondent

---

[3]2T refers to the transcript of the hearing on May 20, 1988 before the District IV Ethics Committee.

had reassured her clients that the matter would be rescheduled (C33E–2 in evidence). Although grievants tried many times to reach respondent, they had no response. On August 11, 1986, their car was repossessed. Again, another petition was filed; however, respondent missed the December court date (1T56). Respondent told her clients that she was going to ask for a postponement at the second court date of February 3, 1987, and that they did not need to appear in court on that date. Despite her assurances, respondent did not attend the February hearing, and grievants received a notice of dismissal, dated February 3, 1987 (C33E–6 in evidence). Grievants then decided to retain other counsel to file a Chapter 7 petition. Although they requested their file from respondent, it has never been returned.

COUNCIL MATTER (IV–87–52E)

On July 13, 1984, Jacqueline Council (grievant) retained respondent to represent her concerning a job-related injury. A contingent fee agreement was executed (C52E–1 in evidence) and grievant was advised by respondent that she would take care of everything (1T40–41). Whenever grievant asked respondent if her case was progressing, she would receive reassurances, including being told, in the summer of 1987, that a settlement check was "in the works" (1T42). Grievant never received this check. After three years, grievant retained another attorney, who called and wrote respondent requesting the file, without receiving any response. Respondent, in her testimony, did not deny grievant's version of the facts.

THOMAS MATTER (IV–87–55E)

In October or November 1984, grievant paid respondent a $100 retainer to represent her in her divorce. During the next three years, grievant asked respondent for progress reports, only to be told that respondent was having difficulty serving papers on grievant's out-of-state husband. Then, in the summer of 1987, respondent told grievant that the papers had been

served and that she was waiting for a court date (1T68). However, investigating on her own, grievant contacted the Camden courthouse and discovered that the complaint had been dismissed twice. Grievant attempted to obtain her file from respondent without success. Grievant then retained another attorney. That attorney requested the file from respondent, but was told that the file had been stolen from respondent's car.

Respondent testified, with regard to the *Connell, Geserick,* and *Aleshire* matters, that she communicated in writing with these clients (2T34), that she missed court dates, because she knew that these clients had retained new counsel, and she thought the new attorneys would be attending the court hearings (2T28). Furthermore, with regard to the *Henry* matter, she testified that Mrs. Henry lost her home due to her own confusion about paying the mortgage, which was the client's responsibility, and not from inaction by respondent (2T21–24). And, finally in the *Watkins* matter, respondent testified that they lost their car because they were unable to make their payments, not because respondent missed the court dates (2T40).

She also testified that her father was seriously ill beginning in September 1983, and that her behavior toward her clients was affected by her personal commitment to helping her father during his illness. She contented that in October 1987, when she met with the investigator and promised to provide files, she did not carry out this promise because she was unknowingly on the brink of a mental collapse because of her father's death just two weeks earlier (2T25–26). To explain her failure to return files to her clients, respondent testified that on or about December 23, 1987, her car was broken into and a large number of her files were taken (2T11; unmarked exhibit entitled Camden Police Incidence Report, admitted into evidence subsequent to the hearing). Respondent admits she did not file a formal answer to the ethics complaints in these matters.

At the May 20, 1988 committee hearing, respondent stated she was no longer in active practice, following the assignment of all her cases to another attorney (2T18; C–6 in evidence). The Office of Attorney Ethics subsequently received information that additional grievants came forth after the May 1988 hearing, who were not made aware that their cases had been transferred to another attorney. Following these new complaints, the Office of Attorney Ethics requested respondent sign a consent order to place her on disability inactive status, pursuant to *R.* 1:20–9(b). Respondent agreed, and this order was entered by the Court on January 12, 1989.

Respondent also promised to provide to the committee, within two weeks of the May 20, 1988 hearing, a medical report from Dr. Foster, a psychologist from whom she was receiving treatment (2T12). She never provided the committee with the promised medical report.

*DRB 90–084*

WISHNICK MATTER (IV–88–2E)

Daniel B. Wishnick, (grievant) accepted a third-party check for groceries in the summer of 1987 (W–1 in evidence). The check was respondent's business check that she had given to a client. In November 1987, after the check was returned for insufficient funds, grievant contacted respondent. Respondent told him to redeposit the check (3T5).[4] Again the check did not clear, and, when grievant tried to contact respondent, he was unsuccessful. On January 6, 1988, he sent respondent a letter threatening to file criminal charges and to notify the Office of Attorney Ethics (W–2 in evidence). On or about January 15, 1988, grievant received a money order from respondent. Respondent did not refute grievant's testimony concerning her lack of action.

---

43T refers to the transcript of the *Wishnick v. Ashley* hearing on January 16, 1989, before the District IV Ethics Committee.

## LOVELAND MATTER (IV–88–6E) [5]

Tina Loveland (grievant) first retained respondent in June 1985, to represent her in a workers' compensation claim. In May 1986, she hired respondent on an unrelated personal injury action. After May 1986, grievant tried to obtain information on a weekly basis concerning both cases; respondent told her not to worry, and that everything was "okay" (T10).[6] When grievant tried to obtain her file, she was unsuccessful. In 1988, grievant retained another attorney to handle both matters. That attorney discovered that nothing had ever been filed in either case.

## BLAKNEY MATTER (IV–88–15E)

In July 1985, Vanessa Blakney (grievant) paid respondent a $500 retainer to represent her in a bankruptcy petition (P–1 in evidence). Grievant regularly contacted respondent to find out how her case was progressing. Respondent assured her that everything was fine. On November 17, 1987, grievant received a writ for possession of her house, which compelled her to leave home (P–2 in evidence). Although two bankruptcy petitions had been filed, both were subsequently dismissed due to respondent's inaction (P–3 in evidence, P–5 in evidence). In addition, the second bankruptcy petition contained the purported signature of grievant. Yet, grievant denies ever signing the petition, or giving respondent permission to sign her name (5T9).

In 1987, grievant had paid $952 to respondent for a mortgage

---

[5]Please note the panel report refers to this matter as the *Vandeveer* matter. The panel chair notified the OAE that references to *Vanderveer* were actually intended to be references to the *Loveland* matter. The *Vandeveer* matter has not been considered yet and remains open.

[6]4T refers to the transcript of the *Loveland v. Ashley* hearing on January 16, 1989, before the District IV Ethics Committee.

payment (5T11).[7] This mortgage payment was not sent to the mortgagee by respondent, and neither the retainer nor the mortgage payment were ever refunded to grievant. Finally, although grievant tried to obtain her file, she was unsuccessful.

The committee noted that respondent neither responded to the investigator's request for information, nor filed a formal answer to the three matters contained in this presentment. The committee found respondent violated *RPC* 1.1(a) and (b) (pattern of neglect and gross neglect); *RPC* 1.3 (lack of diligence); *RPC* 1.4 (lack of communication); and *RPC* 8.4(d) (conduct prejudicial to the administration of justice). The committee also made the recommendation that a period of careful supervision be part of any discipline in this matter.

\*       \*       \*

The Disciplinary Review Board heard the first presentment, docketed as DRB 88–286, on February 21, 1990. Just prior to that hearing, respondent's counsel submitted a letter-memorandum requesting that respondent remain on disability inactive status without further discipline being imposed. (Harvey Johnson letter, dated February 12, 1990). In that letter, counsel stated respondent "continues to receive counseling for her emotional condition". At the Board hearing, he disclosed "she's undergoing treatment on a continuous basis" (BT6).[8] He explained that respondent had been seeing a psychologist, Dr. Foster, on a monthly basis since 1987, and that the sessions were therapeutic in nature. Counsel then stated he would be glad to provide a report from the treating therapist (BT13).

---

[7]5T refers to the transcript of the March 29, 1989 hearing before the District IV Ethics Committee.

[8]BT refers to transcript of the February 21, 1990 hearing before the Disciplinary Review Board.

The Board questioned respondent's counsel concerning whether he felt his client was competent to assist him as counsel. His response was as follows:

Mr. Brierley: Has she been able to assist you in preparation for today's hearing?

Mr. Johnson: Not really. No, sir. I—We've—When I say not really—she has been able to recollect, she's been able to provide me with documents. I would say, but for my appearance here, Mrs. Ashley would not be here, out of fear. She still has a fear of—of appearing
[BT8.]

Counsel has never taken any action to have a guardian appointed, or requested that his client be treated as incapable of assisting counsel.

The Board also asked the presenter if the district ethics committee considered respondent's competency when she appeared *pro se* at the committee level. He stated the committee gave her time to obtain counsel and she decided to represent herself. The committee made a lay judgment she was competent, and the committee was more concerned with encouraging her to cease practice, because of the harm that was occurring to the public (BT9–BT11).

Although a medical treatment report was promised by respondent within two weeks of the May 1988 hearing, and again by her counsel on February 21, 1990, no report was forthcoming until the day before the Board meeting on June 20, 1990. Respondent's first report was a letter by Dr. Foster, who had been respondent's high school counselor. This report, dated June 20, 1990, clearly stated that Dr. Foster had not been providing therapeutic treatment:

I was Denise's high school counselor and since then and throughout the years Denise has kept in touch with me as a friend, big sister, mentor, sharing concerns, problems and accomplishments ...

Denise did not call as frequently as she used to [after father died in September 1987]. When she did call, she was withdrawn, overwhelmed and gloomy—and not functioning ...

When I have seen this type of behavior in the past, the students were in need of professional counseling. I shared this with Denise and **repeatedly encouraged her to seek professional counseling. I explained to her that I was not**

**qualified to give her the type of counseling she needed.** I suggested to Denise that she contact Dr. Vincent Henry, Dr. B. Broussard, or any licensed Psychologist or Psychiatrist of her choosing. Denise called me to tell me that she has started therapy with Dr. Henry [June 5, 1990] ... [emphasis added.]

The second letter was an evaluation report from Dr. Vincent dePaul Henry, Psy.D., a licensed clinical psychologist in Marlton, New Jersey. Dr. Henry indicated that respondent made two appointments in June 1988, which she did not keep, and that her first psychological evaluation took place on June 5 and 6, 1990.[9]

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the committee in finding respondent guilty of unethical conduct are fully supported by clear and convincing evidence.

In each of the aforementioned matters, respondent acted with gross negligence, contrary to *RPC* 1.1(a), and exhibited a pattern of negligence, contrary to *RPC* 1.1(b). In addition, respondent violated *RPC* 1.3, *RPC* 1.4, and *RPC* 8.1(b) by failing to represent diligently or to communicate with her clients, and failing to cooperate with the ethics authorities.

*R.*1:20–9(b) states that disciplinary proceedings shall go forward even after an attorney is placed on disability inactive status, except for the instance where there is a finding that respondent is incapable of assisting counsel in defense of the ethics proceedings. In this matter, the issue of respondent's ability to assist counsel was specifically raised by the Board.

---

[9]This contradicts counsel's earlier statement, at the February 1990 Board meeting, that respondent was receiving treatment. Another contradiction was pointed out in an affidavit from Deputy Counsel of the Clients' Security Fund, indicating that he had notice respondent was working for an attorney in February 1990 doing legal research (Daniel Hendi Certification, dated 6/14/90). This was in direct contradiction to respondent's counsel statement on February 21, 1990, that respondent was not working at all (BT7–8).

Counsel indicated only that his client had a fear of appearing before the Board. He has not raised any claim that his client is not competent to assist him. Therefore, the Board accepts that respondent is and has been competent to assist counsel, and the Board has made a recommendation for discipline.[10]

In this case the record shows clear and convincing evidence of neglect in ten matters, misrepresentations to clients, refusal to return files, and lack of cooperation with the ethics system. In addition, there is a refusal to return retainers on two occasions, contrary to the orders of Bankruptcy Judge Wizmer. Particularly serious is the fact that, on three occasions, respondent signed her client's signatures to bankruptcy petitions without their knowledge.

Respondent's gross neglect of ten matters, in conjunction with other ethics violations, justifies a lengthy suspension. *See, e.g., Matter of Gill,* 114 *N.J.* 246, 553 *A.*2d 1337 (1989) (pattern of neglect in three matters, lack of communication, misrepresenting the status of cases, and failure to maintain trust accounts, while suffering from documented psychiatric problems, warranted a five-year temporary suspension. Conditions of reinstatement included psychiatric evidence of fitness and a one-year proctorship); *Matter of Templeton,* 99 *N.J.* 365, 492 *A.*2d 1001 (1985) (pattern of neglect involving eleven clients, misrepresentation to clients, refusal to return unearned retainers, and failure to cooperate warranted a five-year temporary suspension. Conditions of reinstatement included psychiatric evidence of fitness and working in a supervised capacity); *Matter of Getchius,* 88 *N.J.* 269, 440 *A.*2d 1341 (1982) (neglect

---

[10]Furthermore, the Board questions any action to continue respondent on disability inactive status. Respondent claimed her impairment began in 1983 with her father's worsening illness, yet she failed to seek psychological treatment for six years. Continuance at this time seems inappropriate, especially when reinstatement after discipline is conditioned upon satisfactorily passing a psychiatric examination.

in six matters, and misrepresentation to clients warranted a two-year suspension, with reinstatement conditioned upon medical proof of fitness to practice).

Respondent's signing of her client's signature on three occasions to a bankruptcy petition was also serious misconduct. In the *Connell* matter, this changed the petition from a Chapter 13 filing to a Chapter 7 filing, with its different consequences for the client. Recently, in *Matter of Weston*, 118 *N.J.* 477, 572 *A.*2d 604 (1990), the Court suspended for two years an attorney who signed a client's name to a deed and affidavit of title, and then lied to the buyer's attorney that the signature was genuine. *See* also, *Matter of Chidiac*, 109 *N.J.* 84, 533 *A.*2d 704 (1987) (delivery to bank of forged inheritance tax waiver warranted an indefinite suspension, pending disposition of other disciplinary matters); *Matter of Yacavino*, 100 *N.J.* 50, 494 *A.*2d 801 (1988) (attorney received a three-year suspension for neglect in one matter and preparation of a fictitious order of adoption).

Finally, respondent had an obligation to cooperate fully with the ethics authorities. *Matter of Smith*, 101 *N.J.* 568, 572, 503 *A.*2d 846 (1986). In this case, respondent did not file an answer to any of the complaints, did not cooperate with the investigator, and did not provide the medical documentation, as she promised for over two years. This additional misconduct must be factored into any recommendation for discipline.

In recommending discipline, the interests of the public, the bar, and the respondent must all be considered. *Matter of Kushner*, 101 *N.J.* 397, 400, 502 *A.*2d 32 (1986). The purpose of discipline is not to punish the attorney but to protect the public from the attorney who does not meet the standards of responsibility of every member of the profession. *Matter of Templeton, supra*, 99 *N.J.* at 374, 492 *A.*2d 1001. In recommending the appropriate level of discipline, the Board considered respondent's difficulties surrounding the death of her father as a mitigating factor. Nonetheless, in six years respondent has not

taken steps to rehabilitate herself, or to provide evidence that the public needs no further protection from her.

In view of the foregoing, the Board recommends a two-year suspension, with restoration to practice conditioned upon her satisfactorily passing the core Skills and Methods courses conducted by the Institute for Continuing Legal Education, a psychiatric report demonstrating fitness to practice law, and a one-year proctorship. One member would recommend disbarment based upon the forgery of clients' names and the gross neglect in these ten matters.

The Board further recommends that respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.